# UNITED STATES *v.* GIORDANO ET AL.

No. 72–1057.   Argued January 8, 1974—Decided May 13, 1974

WHITE, J., delivered the opinion of the Court, in Parts I, II, and III of which all Members joined, and in Part IV of which DOUGLAS, BRENNAN, STEWART, and MARSHALL, JJ., joined. DOUGLAS, J., filed a concurring opinion, in which BRENNAN, STEWART, and MARSHALL, JJ., joined, *post,* p. 580. POWELL, J., filed an opinion concurring in Parts I, II, and III of the Court's opinion and dissenting from Part IV, in which BURGER, C. J., and BLACKMUN and REHNQUIST, JJ., joined, *post,* p. 548.

*Solicitor General Bork* argued the cause for the United States. With him on the brief were *Assistant Attorney General Petersen, Harriet S. Shapiro,* and *Sidney M. Glazer.*

*H. Russel Smouse* argued the cause for respondents and filed a brief for respondent Giordano.

MR. JUSTICE WHITE delivered the opinion of the Court.

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 82 Stat. 211–225, 18 U. S. C. §§ 2510–2520, prescribes the procedure for securing judicial authority to intercept wire communications in the investigation of specified serious offenses. The Court must here determine whether the Government sufficiently complied with the required application procedures in this case and whether, if not, evidence obtained as a result of such surveillance, under a court order based on the applications, is admissible at the criminal trial of those whose conversations were overheard. In particular, we must decide whether the provision of 18 U. S. C.

§ 2516 (1.) [1] conferring power on the "Attorney General, or any Assistant Attorney General specially designated by the Attorney General" to "authorize an application to a Federal judge . . . for . . . an order authorizing or approving the interception of wire or oral communications" by federal investigative agencies seeking evidence of certain designated offenses permits the Attorney General's Executive Assistant to validly authorize a wiretap application to be made. We conclude that Congress did not intend the power to authorize wiretap applications to be exercised by any individuals other than the Attorney General or an Assistant Attorney General specially designated by him and that primary or derivative evidence secured by wire interceptions pursuant to a court order issued in response to an application which was, in fact, not authorized by one of the statutorily designated officials must be suppressed under 18 U. S. C. § 2515 upon a motion properly made under 18 U. S. C. § 2518 (10)(a). Accordingly, we affirm the judgment of the Court of Appeals.

## I

In the course of an initial investigation of suspected narcotics dealings on the part of respondent Giordano, it developed that Giordano himself sold narcotics to an undercover agent on October 5, 1970, and also told an informant to call a specified number when interested in transacting narcotics business. Based on this and other information, Francis Brocato, an Assistant United States Attorney, on October 16, 1970, submitted an application to the Chief Judge of the District of Maryland for an order permitting interception of the communications of Giordano, and of others as yet unknown, to or from Giordano's telephone. The application recited that

---

[1] This and other relevant provisions of the statute are contained in the Appendix to this opinion, *post,* p. 534.

Assistant Attorney General Will Wilson had been specially designated by the Attorney General to authorize the application. Attached to the application was a letter from Will Wilson to Brocato which stated that Wilson had reviewed Brocato's request for authorization and had made the necessary probable-cause determinations and which then purported to authorize Brocato to proceed with the application to the court. Also attached were various affidavits of law enforcement officers stating the reasons and justification for the proposed interception. Upon reviewing the application, the Chief Judge issued an order on the same day authorizing the interception "pursuant to application authorized by the Assistant Attorney General . . . Will Wilson, who has been specially designated in this proceeding by the Attorney General . . . to exercise the powers conferred on him by [18 U. S. C. § 2516]." On November 6, the same judge extended the intercept authority based on an application similar in form to the original, but also including information obtained from the interception already authorized and carried out and extending the authority to conversations of additional named individuals calling from or to Giordano's telephone. The interception was terminated on November 18 when Giordano and the other respondents were arrested and charged with violations of the narcotics laws.

Suppression hearings followed pretrial notification by the Government, see § 2518 (9), that it intended to use in evidence the results of the court-authorized interceptions of communications on Giordano's telephone. It developed at the hearings that the applications for interception authority presented to the District Court had inaccurately described the official who had authorized the applications and that neither the initial application for the October 16 order nor the application for the

November 6 extension order had been approved and authorized by Assistant Attorney General Will Wilson, as the applications had indicated. An affidavit of the Executive Assistant to the Attorney General divulged that he, the Executive Assistant, had reviewed the request for authorization to apply for the initial order, had concluded, from his "knowledge of the Attorney General's actions on previous cases, that he would approve the request if submitted to him," and, because the Attorney General was then on a trip away from Washington, D. C., and pursuant to authorization by the Attorney General for him to do so in such circumstances, had approved the request and caused the Attorney General's initials to be placed on a memorandum to Wilson instructing him to authorize Brocato to proceed. The affidavit also stated that the Attorney General himself had approved the November 6 request for extension and had initialed the memorandum to Wilson designating him to authorize Brocato to make application for an extension order. It was also revealed that although the applications recited that they had been authorized by Will Wilson, he had not himself reviewed Brocato's applications, and that his action was at best only formal authorization to Brocato. Furthermore, it became apparent that Wilson did not himself sign either of the letters bearing his name and accompanying the applications to the District Court. Instead, it appeared that someone in Wilson's office had affixed his signature after the signing of the letters had been authorized by a Deputy Assistant Attorney General in the Criminal Division who had, in turn, acted after the approval of the request for authorization had occurred in and had been received from the Office of the Attorney General. The District Court sustained the motions to suppress on the ground that the officer in the Justice Department

approving each application had been misidentified in the applications and intercept orders, in violation of 18 U. S. C. §§ 2518 (1)(a) and (4)(d), *United States* v. *Focarile,* 340 F. Supp. 1033, 1060 (Md. 1972). On the Government's pretrial appeal under 18 U. S. C. § 3731, the Court of Appeals affirmed on the different ground that the authorization of the October 16 wiretap application by the Attorney General's Executive Assistant violated § 2516 (1) of the statute and struck at "the very heart" of Title III, thereby requiring suppression of the wiretap and derivative evidence under §§ 2515 and 2518 (10)(a)(i) and (ii).[2]   469 F. 2d 522, 531 (CA4 1972). We granted certiorari to resolve the conflict with decisions of the Court of Appeals for the Second Circuit[3]

[2] Evidence derived from the unlawful interceptions conducted pursuant to the October 16 wiretap order was held to include the evidence obtained under the November 6 wiretap extension order and also the evidence secured under court orders of October 22 and November 6 extending investigative authority to use a "pen register," *i. e.,* a device that records telephone numbers dialed from a particular phone, which had previously been used to monitor the numbers dialed from Giordano's phone pursuant to a court order of October 8. The applications presented to the District Court to extend wiretap and pen register authority each detailed at considerable length the contents of conversations intercepted pursuant to the October 16 order in support of the requests. We therefore agree with the Court of Appeals, for the reasons discussed in Part IV, *infra,* that evidence gathered under the wiretap and pen register extension orders is tainted by the use of unlawfully intercepted communications under the October 16 order to secure judicial approval for the extensions, and must be suppressed.

[3] The Second Circuit has held that approval of wiretap applications by the Attorney General's Executive Assistant complies with the dictates of § 2516 (1). In *United States* v. *Pisacano,* 459 F. 2d 259 (1972), the court refused to permit withdrawal of guilty pleas on the basis of subsequent discovery that the Executive Assistant had authorized the first of three wiretap applications, declaring that it was "not at all convinced that if this case had gone

with. respect to the administration of the circumscribed authority Congress has granted in Title III for the use of wiretapping and wiretap evidence by law enforcement officers. 411 U. S. 905.

## II

The United States contends that the authorization of intercept applications by the Attorney General's Executive Assistant was not inconsistent with the statute and that even if it were, there being no constitutional violation, the wiretap and derivative evidence should not have been ordered suppressed. We disagree with both contentions.[4]

Turning first to whether the statute permits the authorization of wiretap applications by the Attorney General's Executive Assistant, we begin with the lan-

---

to trial and the court had refused to suppress evidence obtained by the wiretaps, we would have reversed," and that "the Justice Department's procedures were very likely consistent with the mandate of § 2516 (1)." *Id.,* at 264 and n. 5. Shortly thereafter a different panel of that Circuit affirmed judgments of convictions in a case raising the same issue, out of "adherence to the law of the circuit" so recently decided and with the admonition that its decision should "not . . . be construed as an approval of the procedure followed by the Attorney General and his staff." *United States* v. *Becker,* 461 F. 2d 230, 236 (1972). In every other circuit which has considered the issue, suppression of evidence derived from court-approved wire interceptions based on an application authorized by the Attorney General's Executive Assistant has been held to be required by Title III. *United States* v. *Mantello,* 156 U. S. App. D. C. 2, 478 F. 2d 671 (1973); *United States* v. *Roberts,* 477 F. 2d 57 (CA7 1973); *United States* v. *King,* 478 F. 2d 494 (CA9 1973). See also *United States* v. *Robinson,* 468 F. 2d 189 (CA5 1972), remanded for an evidentiary hearing to determine whether the applications were properly authorized under § 2516 (1), 472 F. 2d 973 (en banc 1973).

[4] Because of our disposition of this case, we do not reach the grounds relied upon by the District Court. The issue resolved in the District Court, however, is the subject of the companion case, *United States* v. *Chavez, post,* p. 562.

guage of § 2516 (1), which provides that "[t]he Attorney General, or any Assistant Attorney General specially designated by the Attorney General, may authorize" an application for intercept authority. Plainly enough, the Executive Assistant is neither the Attorney General nor a specially designated Assistant Attorney General; but the United States argues that 28 U. S. C. § 509,[5] deriving from the Reorganization Acts of 1949 and 1950, vests all functions of the Department of Justice, with some exceptions, in the Attorney General, and that Congress characteristically assigns newly created duties to the Attorney General rather than to the Department of Justice, thus making essential the provision for delegation appearing in 28 U. S. C. § 510:

> "The Attorney General may from time to time make such provisions as he considers appropriate authorizing the performance by any other officer, employee, or agency of the Department of Justice of any function of the Attorney General."

It is therefore argued that merely vesting a duty in the Attorney General, as it is said Congress did in § 2516 (1), evinces no intention whatsoever to preclude delegation to other officers in the Department of Justice, including those on the Attorney General's own staff.

---

[5] In full, 28 U. S. C. § 509 provides:

"§ 509. Functions of the Attorney General.

"All functions of other officers of the Department of Justice and all functions of agencies and employees of the Department of Justice are vested in the Attorney General except the functions—

"(1) vested by subchapter II of chapter 5 of title 5 in hearing examiners employed by the Department of Justice;

"(2) of the Federal Prison Industries, Inc.;

"(3) of the Board of Directors and officers of the Federal Prison Industries, Inc.; and

"(4) of the Board of Parole."

As a general proposition, the argument is unexceptionable. But here the matter of delegation is expressly addressed by § 2516, and the power of the Attorney General in this respect is specifically limited to delegating his authority to ·any Assistant Attorney General specially designated by the Attorney General." Despite § 510, Congress does not always contemplate that the duties assigned to the Attorney. General may be freely delegated. Under the Civil Rights Act of 1968, for instance, certain prosecutions are authorized only on the certification of the Attorney General or the Deputy Attorney General, "which function of certification may not be delegated." 18 U. S. C. § 245 (a)(1). Equally precise language forbidding delegation was not employed in the legislation· before us; but we think § 2516 (1), fairly read, was intended to limit the power to ·authorize wiretap applications to the Attorney General himself and to any Assistant Attorney General he might designate. This interpretation of the statute is also strongly supported by its purpose and legislative history.

The purpose of the legislation, which was passed in 1968, was effectively to prohibit, on the pain of criminal and civil penalties,[6] all interceptions of oral and wire communications, except those specifically provided for in the Act, most notably those interceptions permitted to law enforcement officers when authorized by court order in connection with the investigation of the serious crimes listed in § 2516. Judicial wiretap orders must be preceded by applications containing prescribed information, § 2518 (1). The judge must make certain findings before authorizing interceptions, including. the existence of probable cause, § 2518 (3). The orders themselves

---

[6] Criminal sanctions were provided in 18 U. S. C. § 2511, and a civil damages remedy was created by § 2520. See Appendix to this opinion, *post*, p. 534.

must particularize the extent and nature of the interceptions that they authorize, § 2518 (4), and they expire within a specified time unless expressly extended by a judge based on further application by enforcement officials, § 2518 (5). Judicial supervision of the progress of the interception is provided for, § 2518 (6), as is official control of the custody of any recordings or tapes produced by the interceptions carried out pursuant to the order, § 2518 (8). The Act also contains provisions specifying the circumstances and procedures under and by which aggrieved persons may seek and obtain orders for the suppression of intercepted wire or oral communications sought to be used in evidence by the Government. § 2518 (10)(a).

The Act is not as clear in some respects as it might be, but it is at once apparent that it not only limits the crimes for which intercept authority may be obtained but also imposes important preconditions to obtaining any intercept authority at all. Congress legislated in considerable detail in providing for applications and orders authorizing wiretapping and evinced the clear intent to make doubly sure that the statutory authority be used with restraint and only where the circumstances warrant the surreptitious interception of wire and oral communications. These procedures were not to be routinely employed as the initial step in criminal investigation. Rather, the applicant must state and the court must find that normal investigative procedures have been tried and failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous. §§ 2518 (1)(c) and (3)(c). The Act plainly calls for the prior, informed judgment of enforcement officers desiring court approval for intercept authority, and investigative personnel may not themselves ask a judge for authority to wiretap or eavesdrop. The mature judgment of a particular,

responsible Department of Justice official is interposed as a critical precondition to any judicial order.

The legislative history of the Act supports this view. As we have indicated, the Act was passed in 1968, but the provision of § 2516 requiring approval of applications by the Attorney General or a designated Assistant Attorney General dates from 1961, when a predecessor bill was being considered in the 87th Congress. Section 4 (b) of that bill, S. 1495, which was also aimed at prohibiting all but designated official interception, initially provided that the "Attorney General, or any officer of the Department of Justice or any United States Attorney specially designated by the Attorney General, may authorize any investigative or law enforcement officer of the United States or any Federal agency to apply to a judge" for a wire interception order. Hearings on Wiretapping and Eavesdropping Legislation before the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary, 87th Cong., 1st Sess., 5 (1961). Under that phraseology, the authority was centered in the Attorney General, but he could empower any officer of the Department of Justice, including United States Attorneys and the Executive Assistant, to authorize applications for intercept orders. At hearings on the bill, the Assistant Attorney General in charge of the Criminal Division stated the views of the Department of Justice, and the Department later officially proposed, that the authority to approve applications be substantially narrowed so that the Attorney General could delegate his authority only to an Assistant Attorney General. The testimony was:

> "This is the approach of S. 1495, with which the Department of Justice is in general agreement. The bill makes wiretapping a crime unless specifically authorized by a Federal judge in situations involving

specified crimes. As I understand the bill, the application for a court order, could be made only by the authority of the Attorney General or an officer of the Department of Justice or U. S. Attorney authorized by him. I suggest that the bill should confine the power to authorize an application for a court order to the Attorney General and any assistant Attorney General whom he may designate. This would give greater assurance of a responsible executive determination of the need and justifiability of each interception." *Id.*, at 356.

The official proposal was that § 4 (b) be changed to provide that the "Attorney General, or any Assistant Attorney General of the Department of Justice specially designated by the Attorney General, may authorize" a wiretap application. *Id.*, at 372.

S. 1495 was not enacted, but its provision limiting those who could approve applications for court orders survived and was included in almost identical form in later legislative proposals, including the bill that became Title III of the Act now before us.[7] In the course of

---

[7] In 1967, a draft statute prepared by Professor G. Robert Blakey of the University of Notre Dame Law School to regulate the interception of wire and oral communications was published in The President's Commission on Law Enforcement and Administration of Justice, Task Force Report: Organized Crime, Appendix C, at 106–113. In part, it would have added a provision to Title 18, United States Code, which empowered the "Attorney General, or any Assistant Attorney General of the Department of Justice specially designated by the Attorney General" to authorize an application to a federal judge for an order to intercept wire or oral communications. *Id.*, at 108. Senator McClellan introduced a proposed "Federal Wire Interception Act," S. 675, on January 25, 1967, 113 Cong. Rec. 1491, containing, in § 5 (a), the same designations of which federal prosecuting officials could authorize a wiretap application. Hearings on Controlling Crime Through More Effective Law Enforcement before the Subcommittee on Criminal Laws and Procedures of the Senate Com-

testimony before a House Committee in 1967, the drafts-
man of the bill containing the basic outline of Title III
engaged in the following colloquy:

> "The CHAIRMAN. . . . About the origin of the
> application, as I understand it, your bill provides it
> must be originated by the Attorney General or an
> Assistant Attorney General. Am I correct in that
> regard?
>
> "Professor BLAKEY. Yes, you are, Mr. Chair-
> man.
>
> . . . . .
>
> "The CHAIRMAN. The application must be made
> by the Attorney General or an Assistant Attorney
> General.
>
> "Professor BLAKEY. If I am not mistaken, the
> present procedure is before any wiretapping or elec-
> tronic equipment is used now it is generally approved
> at that level anyway, Mr. Chairman, and I would
> not want this equipment used without high level
> responsible officials passing on it. It may very well
> be that in some number of cases there will not be
> time to get the Attorney General to approve it. I
> think we are going to have just [sic] to let those
> cases go, and that if this equipment is to be used
> it ought to be approved by the highest level in the

mittee on the Judiciary, 90th Cong., 1st Sess., 76 (1967). Senator
Hruska later introduced S. 2050 on June 29, 1967, 113 Cong. Rec.
18007, which would have provided for regulated use of electronic
surveillance, as well as wiretapping, and which again made provision,
in a new § 2516 to be added to Title 18, United States Code, for the
same system of approval of applications for the interception of wire
or oral communications as was present in the Blakey bill. Hearings,
*supra*, at 1005. In the House of Representatives, the Blakey bill
was introduced on October 3, 1967, in the form of H. R. 13275, 113
Cong. Rec. 27718. Ultimately, the same operative language was
enacted in Title III.

Department of Justice. If we cannot make certain cases, that is going to have to be the price we will have to pay." Hearings on Anti-Crime Program before Subcommittee No. 5 of the House Committee on the Judiciary, 90th Cong., 1st Sess., 1379 (1967).[8]

---

[8] In the hearings on the McClellan bill, S. 675, see n. 7, *supra*, the limitation on the application authorization power was frequently brought to the fore. Thus, Chief Judge Lumbard of the United States Court of Appeals for the Second Circuit, who had earlier been United States Attorney for the Southern District of New York, noted in testimony on March 8, 1967, that the "application would require approval of the Attorney General or a designated assistant . . . ," and he urged, in support of his recommendation that it was unnecessary to limit the use of wiretapping to the investigation of a narrow group of serious crimes, the fact that there were other factors which would greatly limit the use of wiretapping, beginning with the observation that "the proposed statute, section 5a, provides that only the Attorney General, or any Assistant Attorney General specifically designated by him, may authorize the necessary application to a Federal judge for approval to wiretap. Thus the application will be carefully screened." Hearings on Controlling Crime Through More Effective Law Enforcement, *supra*, n. 7, at 171–172. A letter urging adoption of legislation to govern the area of wiretapping and electronic eavesdropping was sent to the subcommittee on March 7 by all living former United States Attorneys of the Southern District of New York, who recommended that interception be prohibited "unless authorized by a Federal judge on application of the Attorney General, or any Assistant Attorney General of the Department of Justice specially designated by the Attorney General, when such authorized interception or recording may provide evidence of an offense against the laws of the United States." *Id.*, at 511–512. And Senator McClellan himself commented to a judge testifying before the subcommittee:

"This legislation, as you know, requires rather thorough court supervision through the application for a court order made by the Attorney General or officials designated in the bill. A court, of course, would have to weigh the probable cause or the reasonable cause in support of such an application. I do not know how to tighten it up any more than we have in the bill. . . . Can you tell us how to tighten it up any more?" *Id.*, at 894–895.

As it turned out, the House Judiciary Committee did not report out a wiretap bill, but the House did pass H. R. 5037, entitled the "Law Enforcement and Criminal Justice Assistance Act of 1967," 113 Cong. Rec. 21861 (Aug. 8, 1967). The Senate amended that bill by adding to it Title III, which in turn essentially reflected the provisions of S. 917, which had been favorably reported by the Senate Judiciary Committee and which contained the Committee's own proposals with respect to the interception of oral and wire communications. The report on the bill stated:

> "Section 2516 of the new chapter authorizes the interception of particular wire or oral communication under court order pursuant to the authorization of the appropriate Federal, State, or local prosecuting officer.
>
> "Paragraph (1) . . . centralizes in a publicly responsible official subject to the political process the formulation of law enforcement policy on the use of electronic surveillance techniques. Centralization will avoid the possibility that divergent practices might develop. Should abuses occur, the lines of responsibility lead to an identifiable person. This provision in itself should go a long way toward guaranteeing that no abuses will happen." S. Rep. No. 1097, 90th Cong., 2d Sess., 96–97 (1968).

This report is particularly significant in that it not only recognizes that the authority to apply for court orders is to be narrowly confined but also declares that it is to be limited to those responsive to the political process, a category to which the Executive Assistant to the Attorney General obviously does not belong.[9]

---

[9] The Attorney General is appointed by the President, by and with the advice and consent of the Senate, 28 U. S. C. § 503, as

The Senate passed H. R. 5037, with the amendments tracking the provisions of S. 917, on May 23, 1968, as the Omnibus Crime Control and Safe Streets Act of 1968, 114 Cong. Rec. 14798 and 14889. During the proceedings leading to the passage of the bill, emphasis was again placed on § 2516. That the Attorney General had the exclusive authority to approve or provide for the approval of wiretap applications was reiterated, and it was made clear that as the bill was drafted no United States Attorney would have or could be given the authority to apply for an intercept order without the advance approval of a senior officer in the Department.[10]

are the nine Assistant Attorneys General provided for in 28 U. S. C. § 506. The position of Executive Assistant, on the other hand, is established by regulation, to assist the Attorney General, *inter alia,* in the review of "matters submitted for the Attorney General's action" and to "[p]erform such other duties and functions as may be specially assigned from time to time by the Attorney General." 28 CFR § 0.6. It would appear from the Government's brief that the Executive Assistant involved in this case served as Executive Assistant to at least four Attorneys General.

[10] In debate on the Senate floor the day before Title III was adopted, Senator McClellan responded to an inquiry of Senator Lausche in the following matter:

"Mr. LAUSCHE. Does the bill as now written give absolute, unconditional power to stop searches or tapping, or to authorize tapping?

"Mr. McCLELLAN. No. We have to go first to the Attorney General in the case of the Federal Government, and to the chief law enforcement officers of a State . . . .

"Mr. LAUSCHE. There is, then, a prohibition against tapping unless the application is filed with the chief law enforcement official. He approves it and then the application is filed with the court, is that not correct?

"Mr. McCLELLAN. The chief law enforcement officer, like the Attorney General of the United States, must authorize the application . . . . A prosecuting attorney or a U. S. district attorney cannot, on his own motion, do it. He has to get the authority from the

There was no congressional attempt, however, to extend that authority beyond the Attorney General or his Assistant Attorney General designate.

The Government insists that because § 2516 (2) provides for a wider dispersal of authority among state officers to approve wiretap applications and leaves the matter of delegation up to state law,[11] it is inappropriate

---

Attorney General of the United States first to submit the application to the court." 114 Cong. Rec. 14469.

During the same debate, Senator Long read from a report of the Association of the Bar of the City of New York, Committee on Federal Legislation, Committee on Civil Rights, "Proposed Legislation on Wiretapping and Eavesdropping after *Berger* v. *New York* and *Katz* v. *United States*," which commented on the application provisions of Title III in the following manner:

"Who May Apply

"The Blakey Bill provides that applications for wiretapping or eavesdropping orders may be made by only a limited number of persons. At the Federal level these are the Attorney General of the United States or an Assistant Attorney General and at the State level they are the State Attorney General or the principal prosecuting attorney of a political subdivision (such as a county or city District Attorney).

"We agree that responsibility should be focused on those public officials who will be principally accountable to the courts and the public for their actions. Police and investigative agencies should not have the power to make such applications on their own. On the other hand, it seems anomalous to permit only very high Federal officials to apply, excluding such officials as United States Attorneys for entire States or Districts like the Southern District of New York, while permitting county district attorneys with substantially less responsibility to make applications. . . .

"We also would seek to reduce the anomaly referred to above by providing that the Attorney General may delegate to United States Attorneys the power to initiate applications." 114 Cong. Rec. 14473–14474.

[11] The following comments concerning § 2516 (2) are found in S. Rep. No. 1097, 90th Cong., 2d Sess., 98 (1968):

"Paragraph (2) provides that the principal prosecuting attorney of any State or the principal prosecuting attorney of any political

to confine the authority so narrowly on the federal level. But it is apparent that Congress desired to centralize and limit this authority where it was feasible to do so, a desire easily implemented in the federal establishment by confining the authority to approve wiretap applications to the Attorney General or a designated Assistant Attorney General. To us, it appears wholly at odds with the scheme and history of the Act to construe § 2516 (1) to permit the Attorney General to delegate his authority at will, whether it be to his Executive Assistant or to any officer in the Department other than an Assistant Attorney General.[12]

---

subdivision of a State may authorize an application to a State judge of competent jurisdiction . . . for an order authorizing the interception of wire or oral communications. The issue of delegation by that officer would be a question of State law. In most States, the principal prosecuting attorney of the State would be the attorney general. The important question, however, is not name but function. The intent of the proposed provision is to provide for the centralization of policy relating to statewide law enforcement in the area of the use of electronic surveillance in the chief prosecuting officer of the State. . . . Where no such office exists, policymaking would not be possible on a statewide basis; it would have to move down to the next level of government. In most States, the principal prosecuting attorney at the next political level of a State, usually the county, would be the district attorney, State's attorney, or county solicitor. The intent . . . is to centralize areawide law enforcement policy in him. . . . Where there are both an attorney general and a district attorney, either could authorize applications, the attorney general anywhere in the State and the district attorney anywhere in his county. The proposed provision does not envision a further breakdown. Although city attorneys may have in some places limited criminal prosecuting jurisdiction, the proposed provision is not intended to include them."

[12] We also deem it clear that the authority must be exercised *before* the application is presented to a federal judge. The suggestion that it is acceptable practice under § 2516 (1) for the Attorney General's Executive Assistant to approve wiretap applications in the Attorney General's absence if the Attorney General

## III

We also reject the Government's contention that even if the approval by the Attorney General's Executive Assistant of the October 16 application did not comply with the statutory requirements, the evidence obtained from the interceptions should not have been suppressed. The issue does not turn on the judicially fashioned exclusionary rule aimed at deterring violations of Fourth Amendment rights, but upon the provisions of Title III; and, in our view, the Court of Appeals correctly suppressed the challenged wiretap evidence.

Section 2515 provides that no part of the contents of any wire or oral communication, and no evidence derived therefrom, may be received at certain proceedings, including trials, "if the disclosure of that information would be in violation of this chapter." What disclosures are forbidden, and are subject to motions to suppress, is in turn governed by § 2518 (10)(a), which provides for suppression of evidence on the following grounds:

> "(i) the communication was unlawfully intercepted;

---

subsequently, after a court order has issued, ratifies the giving of approval in the particular instance, either directly or by personally approving the submission of a further application for an extension order, as in this case, is wide of the mark. As the Court of Appeals for the Fifth Circuit noted in the panel decision in *United States* v. *Robinson,* 468 F. 2d, at 193, the Attorney General's "authority from Congress was to initiate wiretap applications, not to seek to have those terminated he found should never have been requested in the first place." It would ill serve the congressional policy of having the Attorney General or one of his Assistants screen the applications prior to their submission to court to have the screening process occur after the application is made and after investigative officials have already begun to intercept wire or oral communications under a court order predicated on the assumption that proper authorization to apply for intercept authority had been given.

"(ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or

"(iii) the interception was not made in conformity with the order of authorization or approval."[13]

The Court of Appeals held that the communications the Government desired to offer in evidence had been "unlawfully intercepted" within the meaning of paragraph (i), because the October application had been approved by the Executive Assistant to the Attorney General rather than by the Attorney General himself or a designated Assistant Attorney General.[14] We have already determined that delegation to the Executive Assistant was indeed contrary to the statute; but the Government contends that approval by the wrong official is a statutory violation only and that paragraph (i) must be construed to reach constitutional, but not statutory, violations.[15] The argument is a straightforward one based on the structure of § 2518 (10)(a). On the one hand, the unlawful interceptions referred to in para-

[13] No question is raised in this case concerning the manner of conducting the court-approved interceptions of Giordano's telephone and thus § 2518 (10)(a)(iii) is inapplicable to the present situation.

[14] The Court of Appeals also held that suppression was required under subdivision (ii) on the theory that the absence of any valid authorization of the wiretap application was the equivalent of failing to identify at all in the interception order the person who authorized the application, rendering the order "insufficient on its face." Manifestly, however, the order, on its face, clearly, though erroneously, identified Assistant Attorney General Wilson as the Justice Department officer authorizing the application, pursuant to special designation by the Attorney General. As it stood, the intercept order was facially sufficient under § 2516 (1), and despite what was subsequently discovered, the Court of Appeals was in error in justifying suppression under § 2518 (10)(a)(ii).

[15] The Government suggested at oral argument that, in addition to constitutional violations, willful statutory violations might also fit within the terms of § 2518 (10)(a)(i). Tr. of Oral Arg. 33.

graph (i) must include some constitutional violations. Suppression for lack of probable cause, for example, is not provided for in so many words and must fall within paragraph (i) unless, as is most unlikely, the statutory suppression procedures were not intended to reach constitutional violations at all. On the other hand paragraphs (ii) and (iii) plainly reach some purely statutory defaults without constitutional overtones, and these omissions cannot be deemed unlawful interceptions under paragraph (i), else there would have been no necessity for paragraphs (ii) and (iii)—or to put the matter another way, if unlawful interceptions under paragraph (i) include purely statutory issues, paragraphs (ii) and (iii) are drained of all meaning and are surplusage. The conclusion of the argument is that if nonconstitutional omissions reached by paragraphs (ii) and (iii) are not unlawful interceptions under paragraph (i), then there is no basis for holding that "unlawful interceptions" include *any* such statutory matters; the *only* purely statutory transgressions warranting suppression are those falling within paragraphs (ii) and (iii).

The position gains some support from the fact that predecessor bills specified a fourth ground for suppression—the lack of probable cause—which was omitted in subsequent bills, apparently on the ground that it was not needed because official interceptions without probable cause would be unlawful within the meaning of paragraph (i).[16] Arguably, the inference is that since

---

[16] The draft statute prepared by Professor Blakey provided this fourth ground warranting suppression in cases where there was no probable cause for believing the existence of the grounds on which the interception order was issued. Task Force Report: Organized Crime, *supra,* n. 7, at 111, § 3803 (k)(1)(C). So did the McClellan bill, S. 675, which was introduced prior to *Berger* v. *New York,* 388 U. S. 41 (1967). Hearings on Controlling Crime Through More Effective Law Enforcement, *supra,* n. 7, at 78, § 8 (g)(3). But the

paragraphs (ii) and (iii) were retained, they must have been considered "necessary," that is, not covered by paragraph (i).

The argument of the United States has substance, and it does appear that paragraphs (ii) and (iii) must be deemed to provide suppression for failure to observe some statutory requirements that would not render interceptions unlawful under paragraph (i). But it does not necessarily follow, and we cannot believe, that no statutory infringements whatsoever are also unlawful interceptions within the meaning of paragraph (i). The words "unlawfully intercepted" are themselves not limited to constitutional violations, and we think Congress intended to require suppression where there is failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device. We have already determined that Congress intended not only to limit resort to wiretapping to certain crimes and situations where probable cause is present but also to condition the use of intercept procedures upon the judgment of a senior official in the Department of Justice that the situation is one of those warranting their use. It is

bill proposed by Senator Hruska after *Berger* (S. 2050) omitted th s ground in a provision the language of which is substantially identical to § 2518 (10) (a) as finally enacted. *Id.*, at 1008, § 2518 (k) (1). An explanation for the omission is provided in an appendix comparirg S. 675 with S. 2050, which was published by Senator Scott, a cosponsor of the latter bill, in an article in the Howard Law Journal, Wiretapping and Organized Crime, 14 How. L. J. 1 (1968), and which was reprinted in Senator Scott's remarks on the Senate floor concerning the Omnibus Crime Control and Safe Streets Act of 1968. 114 Cong. Rec. 13205–13211. It is there simply stated that "Senator Hruska's man says that the probable cause test is implied in (1)." *Id.*, at 13211.

reasonable to believe that such a precondition would inevitably foreclose resort to wiretapping in various situations where investigative personnel would otherwise seek intercept authority from the court and the court would very likely authorize its use. We are confident that the provision for pre-application approval was intended to play a central role in the statutory scheme and that suppression must follow when it is shown that this statutory requirement has been ignored.

The principal piece of legislative history relative to this question is S. Rep. No. 1097, 90th Cong., 2d Sess. (1968). The Government emphasizes that the report expressly states that § 2518 (10)(a) "largely reflects existing law" and that there was no intention to "press the scope of the suppression role beyond present search and seizure law." *Id.*, at 96. But the report also states that the section provides for suppression of evidence directly or indirectly obtained "in violation of the chapter" and that the provision "should serve to guarantee that the standards of the new chapter will sharply curtail the unlawful interception of wire and oral communications." [17] Moreover, it would not extend existing search-

---

[17] In relevant part S. Rep. No. 1097, *supra,* n. 11, at 96, 106, provides:

. "Section 2515 of the new chapter imposes an evidentiary sanction to compel compliance with the other prohibitions of the chapter. . . . The provision must, of course, be read in light of section 2518 (10)(a) discussed below, which defines the class entitled to make a motion to suppress. It largely reflects existing law. It applies to suppress evidence directly (*Nardone* v. *United States,* 302 U. S. 379 (1937)) or indirectly obtained in violation of the chapter. (*Nardone* v. *United States,* 308 U. S. 338 (1939).) There is, however, no intention to change the attenuation rule. . . . Nor generally to press the scope of the suppression role beyond present search and seizure law. . . . But it does apply across the board in both Federal and State proceeding[s]. . . . And it is not limited to criminal proceedings. Such a suppression rule is necessary and proper to protect privacy. . . . The provision thus forms an integral part of the system of limita-

and-seizure law for Congress to provide for the suppression of evidence obtained in violation of explicit statutory prohibitions. *Nardone* v. *United States,* 302 U. S. 379 (1937); *Nardone.* v. *United States,* 308 U. S. 338 (1939).[18]

## IV

Even though suppression of the wire communications intercepted under the October 16, 1970, order is required, the Government nevertheless contends that com-

---

tions designed to protect privacy. Along with the criminal and civil remedies, it should serve to guarantee that the standards of the new chapter will sharply curtail the unlawful interception of wire and oral communications.

"[Section 2518 (10) (a)] must be read in connection with sections 2515 and 2517, discussed above, which it limits. It provides the remedy for the right created by section 2515. [Except for its inapplicability to grand jury proceedings and an absence of intent to grant jurisdiction to federal courts over Congress,] [o]therwise, the scope of the provision is intended to be comprehensive."

[18] We find without substance the Government's suggestion that since 18 U. S. C. § 2511 (1)(c) makes criminal the "willful" disclosure of the contents of an intercepted. communication, "knowing or having reason to know that the information was obtained through the interception of a wire or oral communication in violation of this subsection," and § 2515 ties the propriety of suppression of evidence to the impropriety of its "disclosure," to hold that statutory violations committed in the Justice Department's internal approval and submission procedures with respect to wiretap applications preclude disclosure in court would be to attribute to Congress an intent to impose substantial criminal penalties for "every defect in processing. applications." Brief for United States 38. Apart from the fact that a majority of the Court in *United States* v. *Chavez, post,* p. 562, has concluded that not every defect will warrant suppression, it is evident that § 2511 does not impose criminal liability unless disclosure is "willful" and unless the information was known to have been obtained in violation of § 2511 (1): Clearly, the circumstances under which suppression of evidence would be required are not necessarily the same as those under which a criminal violation of Title III would be found.

munications intercepted under the November 6 extension order are admissible because they are not "evidence derived" from the contents of communications intercepted under the October 16 order within the meaning of §§ 2515 and 2518 (10)(a). This position is untenable.

Under § 2518, extension orders do not stand on the same footing as original authorizations but are provided for separately. "Extensions of an order may be granted, but only upon application for an extension made in accordance with subsection (1) of this section and the court making the findings required by subsection (3) of this section." § 2518 (5). Under subsection (1)(e), applications for extensions must reveal previous applications and orders, and under (1)(f) must contain "a statement setting forth the results thus far obtained from the interception, or a reasonable explanation of the failure to obtain such results." Based on the application, the court is required to make the same findings that are required in connection with the original order; that is, it must be found not only that there is probable cause in the traditional sense and that normal investigative procedures are unlikely to succeed but also that there is probable cause for believing that particular communications concerning the offense will be obtained through the interception and for believing that the facilities or place from which the wire or oral communications are to be intercepted are used or will be used in connection with the commission of such offense or are under lease to the suspect or commonly used by him. § 2518 (3).

In its November 6 application, the Government sought authority to intercept the conversations of not only Giordano, who alone was expressly named in the initial application and order, but of nine other named persons who were alleged to be involved with Giordano in narcotics violations. Based on the attached affidavit, it was alleged that there was probable cause to believe that

communications concerning the offense involved would be intercepted, particularly those between Giordano and the other named individuals, as well as those with others as yet unnamed, and that the telephone listed in the name of Giordano and whose monitoring was sought to be continued "has been used, and is being used and will be used, in connection with the commission of the offenses described." App. 62.

In the affidavit supporting the application, the United States set out the previous applications and orders, incorporated by reference and reasserted the "facts, details and conclusions contained in [the] affidavits" supporting the prior wiretap application, and set down in detail the relevant communications overheard under the existing order, as well as the physical movements of Giordano observed as the result of an around-the-clock surveillance that had been conducted by the authorities. App. 65–81. The Government concluded "[a]fter analyzing the intercepted conversations to and from [Giordano's telephone] and the results of BNDD surveillance" that nine listed individuals, some identified only by aliases, were associated with Giordano as suppliers or buyers in illegal narcotics trafficking and that certain other persons were perhaps connected with the operation in an as yet undisclosed fashion. *Id.,* at 79–80. It was also said that the full scope of Giordano's organization was not yet known. *Id.,* at 80. Assertedly, Giordano was extremely guarded in his telephone conversations, "any specific narcotics conversations he makes are from pay phones," and "[c]onventional surveillance would be completely ineffective except as an adjunct to electronic interception." *Id.,* at 81. The United States accordingly requested an extension of the interception order for no longer than a 15-day period.

It is apparent from the foregoing that the communications intercepted pursuant to the extension order were

evidence derived from the communications invalidly intercepted pursuant to the initial order. In the first place, the application sought and the order granted authority to intercept the communications of various named individuals not mentioned in the initial order. It is plain from the affidavit submitted that information about most of these persons was obtained through the initial illegal interceptions. It is equally plain that the telephone monitoring and accompanying surveillance were coordinated operations, necessarily intertwined. As the Government asserted, the surveillance and conventional investigative techniques "would be completely ineffective except as an adjunct to electronic interception." That the extension order and the interceptions under it were not in fact the product of the earlier electronic surveillance is incredible.

Second, an extension order could validly be granted *only* upon an application complying with subsection (1) of § 2518. Subsection (1)(e) requires that the fact of prior applications and orders be revealed, and (1)(f) directs that the application set out either the results obtained under the prior order or an explanation for the absence of such results. Plainly the function of § 2518 (1)(f) is to permit the court realistically to appraise the probability that relevant conversations will be overheard in the future. If during the initial period, no communications of the kind that had been anticipated had been overheard, the Act requires an adequate explanation for the failure before the necessary findings can be made as a predicate to an extension order. But here there were results, and they were set out in great detail. Had they been omitted no extension order at all could have been granted; but with them, there were sufficient facts to warrant the trial court's finding, in accordance with § 2518 (3)(b), of probable cause to believe that wire communications concerning the offenses involved "will

be obtained through the interception," App. 83, as well as the finding complying with § 2518 (3)(d) that there was probable cause to believe that Giordano's telephone "has been used, is being used, and will be used, in connection with the commission of the offenses described above and is commonly used by Nicholas Giordano . . ." and nine other named persons. *Ibid.*

It is urged in dissent that the information obtained from the illegal October 16 interception order may be ignored and that the remaining evidence submitted in the extension application was sufficient to support the extension order. But whether or not the application, without the facts obtained from monitoring Giordano's telephone, would independently support original wiretap authority, the Act itself forbids extensions of prior authorizations without consideration of the results meanwhile obtained. Obviously, those results were presented, considered, and relied on in this case. Moreover, as previously noted, the Government itself had stated that the wire interception was an indispensable factor in its investigation and that ordinary surveillance alone would have been insufficient. In our view, the results of the conversations overheard under the initial order were essential, both in fact and in law, to any extension of the intercept authority. Accordingly, communications intercepted under the extension order are derivative evidence and must be suppressed.[19] The judgment of the Court of Appeals is

*Affirmed.*

[For concurring opinion of MR. JUSTICE DOUGLAS, see *post,* p. 580.]

---

[19] We are also of the view that the evidence obtained from the extended authorizations of October 22 and November 6 for the installation and use of the pen register device on Giordano's

APPENDIX TO OPINION OF THE COURT

RELEVANT PROVISIONS OF TITLE III, OMNIBUS CRIME CONTROL AND SAFE STREETS ACT OF 1968, 18 U. S. C. §§ 2510–2520

§ 2511. Interception and disclosure of wire or oral communications prohibited.

(1) Except as otherwise specifically provided in this chapter any person who—

(a) willfully intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire or oral communication;

(b) willfully uses, endeavors to use, or procures any other person to use or endeavor to use any electronic, mechanical, or other device to intercept any oral communication when—

(i) such device is affixed to, or otherwise transmits a signal through, a wire, cable, or other like connection used in wire communication; or

(ii) such device transmits communications by radio, or interferes with the transmission of such communication; or

(iii) such person knows, or has reason to know,

---

telephone was inadmissible because derived from the invalid wire interception that began on October 16. See n. 2, *supra*. The application for the October 22 extension attached the logs of telephone conversations monitored under the October 16 order and asserted that these logs revealed the "continued use of the telephone . . . for conversations regarding illegal trafficking in narcotics." App. 55. In these circumstances, it appears to us that the illegally monitored conversations should be considered a critical element in extending the pen register authority. We have been furnished with nothing to indicate that the pen register extension of November 6 should be accorded any different treatment.

that such device or any component thereof has been sent through the mail or transported in interstate or foreign commerce; or

(iv) such use or endeavor to use (A) takes place on the premises of any business or other commercial establishment the operations of which affect interstate or foreign commerce; or (B) obtains or is for the purpose of obtaining information relating to the operations of any business or other commercial establishment the operations of which affect interstate or foreign commerce; or

(v) such person acts in the District of Columbia, the Commonwealth of Puerto Rico, or any territory or possession of the United States;

(c) willfully discloses, or endeavors to disclose, to any other person the contents of any wire or oral communication, knowing or having reason to know that the information was obtained through the interception of a wire or oral communication in violation of this subsection; or

(d) willfully uses, or endeavors to use, the contents of any wire or oral communication, knowing or having reason to know that the information was obtained through the interception of a wire or oral communication in violation of this subsection;

shall be fined not more than $10,000 or imprisoned not more than five years, or both.

(2) (a)(i) It shall not be unlawful under this chapter for an operator of a switchboard, or an officer, employee, or agent of any communication common carrier, whose facilities are used in the transmission of a wire communication, to intercept, disclose, or use that communication in the normal course of his employment while engaged in any activity which is a necessary incident to the rendition

of his service or to the protection of the rights or property of the carrier of such communication: *Provided,* That said communication common carriers shall not utilize service observing or random monitoring except for mechanical or service quality control checks.

(ii) It shall not be unlawful under this chapter for an officer, employee, or agent of any communication common carrier to provide information, facilities, or technical assistance to an investigative or law enforcement officer who, pursuant to this chapter, is authorized to intercept a wire or oral communication.

(b) It shall not be unlawful under this chapter for an officer, employee, or agent of the Federal Communications Commission, in the normal course of his employment and in discharge of the monitoring responsibilities exercised by the Commission in the enforcement of chapter 5 of title 47 of the United States Code, to intercept a wire communication, or oral communication transmitted by radio, or to disclose or use the information thereby obtained.

(c) It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire or oral communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception.

(d) It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire or oral communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State or for the purpose of committing any other injurious act.

(3) Nothing contained in this chapter or in section 605 of the Communications Act of 1934 (48 Stat. 1143; 47 U. S. C. 605) shall limit the constitutional power of the President to take such measures as he deems necessary to protect the Nation against actual or potential attack or other hostile acts of a foreign power, to obtain foreign intelligence information deemed essential to the security of the United States, or to protect national security information against foreign intelligence activities. Nor shall anything contained in this chapter be deemed to limit the constitutional power of the President to take such measures as he deems necessary to protect the United States against the overthrow of the Government by force or other unlawful means, or against any other clear and present danger to the structure or existence of the Government. The contents of any wire or oral communication intercepted by authority of the President in the exercise of the foregoing powers may be received in evidence in any trial hearing, or other proceeding only where such interception was reasonable, and shall not be otherwise used or disclosed except as is necessary to implement that power.

.     .     .     .     .

§ 2515. Prohibition of use as evidence of intercepted wire or oral communications.

Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter.

## § 2516. Authorization for interception of wire or oral communications.

(1) The Attorney General, or any Assistant Attorney General specially designated by the Attorney General, may authorize an application to a Federal judge of competent jurisdiction for, and such judge may grant in conformity with section 2518 of this chapter an order authorizing or approving the interception of wire or oral communications by the Federal Bureau of Investigation, or a Federal agency having responsibility for the investigation of the offense as to which the application is made, when such interception may provide or has provided evidence of—

(a) any offense punishable by death or by imprisonment for more than one year under sections 2274 through 2277 of title 42 of the United States Code (relating to the enforcement of the Atomic Energy Act of 1954), or under the following chapters of this title: chapter 37 (relating to espionage), chapter 105 (relating to sabotage), chapter 115 (relating to treason), or chapter 102 (relating to riots);

(b) a violation of section 186 or section 501 (c) of title 29, United States Code (dealing with restrictions on payments and loans to labor organizations), or any offense which involves murder, kidnapping, robbery, or extortion, and which is punishable under this title;

(c) any offense which is punishable under the following sections of this title: section 201 (bribery of public officials and witnesses), section 224 (bribery in sporting contests), subsection (d), (e), (f), (g), (h), or (i) of section 844 (unlawful use of explosives), section 1084 (transmission of wagering information), section 1503 (influencing or injuring an officer, juror, or witness generally), section 1510 (obstruction of criminal investigations), section 1511 (obstruction of

State or local law enforcement), section 1751 (Presidential assassinations, kidnapping, and assault), section 1951 (interference with commerce by threats or violence), section 1952 (interstate and foreign travel or transportation in aid of racketeering enterprises), section 1954 (offer, acceptance, or solicitation to influence operations of employee benefit plan), section 1955 (prohibition of business enterprises of gambling), section 659 (theft from interstate shipment), section 664 (embezzlement from pension and welfare funds), sections 2314 and 2315 (interstate transportation of stolen property), section 1963 (violations with respect to racketeer influenced and corrupt organizations) or section 351 (violations with respect to congressional assassination, kidnapping, and assault);

(d) any offense involving counterfeiting punishable under section 471, 472, or 473 of this title;

(e) any offense involving bankruptcy fraud or the manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in narcotic drugs, marihuana, or other dangerous drugs, punishable under any law of the United States;

(f) any offense including extortionate credit transactions under sections 892, 893, or 894 of this title; or

(g) any conspiracy to commit any of the foregoing offenses.

(2) The principal prosecuting attorney of any State, or the principal prosecuting attorney of any political subdivision thereof, if such attorney is authorized by a statute of that State to make application to a State court judge of competent jurisdiction for an order authorizing or approving the interception of wire or oral communications, may apply to such judge for, and such judge may grant in conformity with section 2518 of this chap-

ter and with the applicable State statute an order authorizing, or approving the interception of wire or oral communications by investigative or law enforcement officers having responsibility for the investigation of the offense as to which the application is made, when such interception may provide or has provided evidence of the commission of the offense of murder, kidnapping, gambling, robbery, bribery, extortion, or dealing in narcotic drugs, marihuana or other dangerous drugs, or other crime dangerous to life, limb, or property, and punishable by imprisonment for more than one year, designated in any applicable State statute authorizing such interception, or any conspiracy to commit any of the foregoing offenses.

§ 2518. Procedure for interception of wire or oral communications.

(1) Each application for an order authorizing or approving the interception of a wire or oral communication shall be made in writing upon oath or affirmation to a judge of competent jurisdiction and shall state the applicant's authority to make such application. Each application shall include the following information:

(a) the identity of the investigative or law enforcement officer making the application, and the officer authorizing the application;

(b) a full and complete statement of the facts and circumstances relied upon by the applicant, to justify his belief that an order should be issued, including (i) details as to the particular offense that has been, is being, or is about to be committed, (ii) a particular description of the nature and location of the facilities from which or the place where the communication is to be intercepted, (iii) a particular description of the type of communications

sought to be intercepted, (iv) the identity of the person, if known, committing the offense and whose communications are to be intercepted;

(c) a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous;

(d) a statement of the period of time for which the interception is required to be maintained. If the nature of the investigation is such that the authorization for interception should not automatically terminate when the described type of communication has been first obtained, a particular description of facts establishing probable cause to believe that additional communications of the same type will occur thereafter;

(e) a full and complete statement of the facts concerning all previous applications known to the individual authorizing and making the application, made to any judge for authorization to intercept, or for approval of interceptions of, wire or oral communications involving any of the same persons, facilities or places specified in the application, and the action taken by the judge on each such application; and

(f) where the application is for the extension of an order, a statement setting forth the results thus far obtained from the interception, or a reasonable explanation of the failure to obtain such results.

(2) The judge may require the applicant to furnish additional testimony or documentary evidence in support of the application.

(3) Upon such application the judge may enter an ex parte order, as requested or as modified, authorizing or approving interception of wire or oral communications

within the territorial jurisdiction of the court in which the judge is sitting, if the judge determines on the basis of the facts submitted by the applicant that—

    (a) there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in section 2516 of this chapter;

    (b) there is probable cause for belief that particular communications concerning that offense will be obtained through such interception;

    (c) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried, or to be too dangerous;

    (d) there is probable cause for belief that the facilities from which, or the place where, the wire or oral communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person.

    (4) Each order authorizing or approving the interception of any wire or oral communication shall specify—

    (a) the identity of the person, if known, whose communications are to be intercepted;

    (b) the nature and location of the communications facilities as to which, or the place where, authority to intercept is granted;

    (c) a particular description of the type of communication sought to be intercepted, and a statement of the particular offense to which it relates;

    (d) the identity of the agency authorized to intercept the communications, and of the person authorizing the application; and

    (e) the period of time during which such interception is authorized, including a statement as to whether

or not the interception shall automatically terminate when the described communication has been first obtained.

An order authorizing the interception of a wire or oral communication shall, upon request of the applicant, direct that a communication common carrier, landlord, custodian or other person shall furnish the applicant forthwith all information, facilities, and technical assistance necessary to accomplish the interception unobtrusively and with a minimum of interference with the services that such carrier, landlord, custodian, or person is according the person whose communications are to be intercepted. Any communication common carrier, landlord, custodian or other person furnishing such facilities or technical assistance shall be compensated therefor by the applicant at the prevailing rates.

(5) No order entered under this section may authorize or approve the interception of any wire or oral communication for any period longer than is necessary to achieve the objective of the authorization, nor in any event longer than thirty days. Extensions of an order may be granted, but only upon application for an extension made in accordance with subsection (1) of this section and the court making the findings required by subsection (3) of this section. The period of extension shall be no longer than the authorizing judge deems necessary to achieve the purposes for which it was granted and in no event for longer than thirty days. Every order and extension thereof shall contain a provision that the authorization to intercept shall be executed as soon as practicable, shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter, and must terminate upon attainment of the authorized objective, or in any event in thirty days.

(6) Whenever an order authorizing interception is entered pursuant to this chapter, the order may require reports to be made to the judge who issued the order showing what progress has been made toward achievement of the authorized objective and the need for continued interception. Such reports shall be made at such intervals as the judge may require.

(7) Notwithstanding any other provision of this chapter, any investigative or law enforcement officer, specially designated by the Attorney General or by the principal prosecuting attorney of any State or subdivision thereof acting pursuant to a statute of that State, who reasonably determines that—

(a) an emergency situation exists with respect to conspiratorial activities threatening the national security interest or to conspiratorial activities characteristic of organized crime that requires a wire or oral communication to be intercepted before an order authorizing such interception can with due diligence be obtained, and

(b) there are grounds upon which an order could be entered under this chapter to authorize such interception,

may intercept such wire or oral communication if an application for an order approving the interception is made in accordance with this section within forty-eight hours after the interception has occurred, or begins to occur. In the absence of an order, such interception shall immediately terminate when the communication sought is obtained or when the application for the order is denied, whichever is earlier. In the event such application for approval is denied, or in any other case where the interception is terminated without an order having been issued, the contents of any wire or oral communication intercepted shall be treated as having been obtained

in violation of this chapter, and an inventory shall be served as provided for in subsection (d) of this section on the person named in the application.

(8)(a) The contents of any wire or oral communication intercepted by any means authorized by this chapter shall, if possible, be recorded on tape or wire or other comparable device. The recording of the contents of any wire or oral communication under this subsection shall be done in such a way as will protect the recording from editing or other alterations. Immediately upon the expiration of the period of the order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions. Custody of the recordings shall be wherever the judge orders. They shall not be destroyed except upon an order of the issuing or denying judge and in any event shall be kept for ten years. Duplicate recordings may be made for use or disclosure pursuant to the provisions of subsections (1) and (2) of section 2517 of this chapter for investigations. The presence of the seal provided for by this subsection, or a satisfactory explanation for the absence thereof, shall be a prerequisite for the use or disclosure of the contents of any wire or oral communication or evidence derived therefrom under subsection (3) of section 2517.

(b) Applications made and orders granted under this chapter shall be sealed by the judge. Custody of the applications and orders shall be wherever the judge directs. Such applications and orders shall be disclosed only upon a showing of good cause before a judge of competent jurisdiction and shall not be destroyed except on order of the issuing or denying judge, and in any event shall be kept for ten years.

(c) Any violation of the provisions of this subsection may be punished as contempt of the issuing or denying judge.

(d) Within a reasonable time but not later than ninety days after the filing of an application for an order of approval under section 2518 (7)(b) which is denied or the termination of the period of an order or extensions thereof, the issuing or denying judge shall cause to be served, on the persons named in the order or the application, and such other parties to intercepted communications as the judge may determine in his discretion that is in the interest of justice, an inventory which shall include notice of—

(1) the fact of the entry of the order or the application;

(2) the date of the entry and the period of authorized, approved or disapproved interception; or the denial of the application; and

(3) the fact that during the period wire or oral communications were or were not intercepted.

The judge, upon the filing of a motion, may in his discretion make available to such person or his counsel for inspection such portions of the intercepted communications, applications and orders as the judge determines to be in the interest of justice. On an ex parte showing of good cause to a judge of competent jurisdiction the serving of the inventory required by this subsection may be postponed.

(9) The contents of any intercepted wire or oral communication or evidence derived therefrom shall not be received in evidence or otherwise disclosed in any trial, hearing, or other proceeding in a Federal or State court unless each party, not less than ten days before the trial, hearing, or proceeding, has been furnished with a copy of the court order, and accompanying application, under which the interception was authorized or approved. This ten-day period may be waived by the judge if he finds that it was not possible to furnish the party with

the above information ten days before the trial, hearing, or proceeding and that the party will not be prejudiced by the delay in receiving such information.

(10)(a) Any aggrieved person in any trial, hearing, or proceeding in or before any court, department, officer, agency, regulatory body, or other authority of the United States, a State, or a political subdivision thereof, may move to suppress the contents of any intercepted wire or oral communication, or evidence derived therefrom, on the grounds that—

(i) the communication was unlawfully intercepted;

(ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or

(iii) the interception was not made in conformity with the order of authorization or approval.

Such motion shall be made before the trial, hearing, or proceeding unless there was no opportunity to make such motion or the person was not aware of the grounds of the motion. If the motion is granted, the contents of the intercepted wire or oral communication, or evidence derived therefrom, shall be treated as having been obtained in violation of this chapter. The judge, upon the filing of such motion by the aggrieved person, may in his discretion make available to the aggrieved person or his counsel for inspection such portions of the intercepted communication or evidence derived therefrom as the judge determines to be in the interests of justice.

(b) In addition to any other right to appeal, the United States shall have the right to appeal from an order granting a motion to suppress made under paragraph (a) of this subsection, or the denial of an application for an order of approval, if the United States attorney shall certify to the judge or other official granting such motion or denying such application that the appeal

is not taken for purposes of delay. Such appeal shall be taken within thirty days after the date the order was entered and shall be diligently prosecuted.

§ 2520. Recovery of civil damages authorized.

Any person whose wire or oral communication is intercepted, disclosed, or used in violation of this chapter shall (1) have a civil cause of action against any person who intercepts, discloses, or uses, or procures any other person to intercept, disclose, or use such communications, and (2) be entitled to recover from any such person—

(a) actual damages but not less than liquidated damages computed at the rate of $100 a day for each day of violation or $1,000, whichever is higher;

(b) punitive damages; and

(c) a reasonable attorney's fee and other litigation costs reasonably incurred.

A good faith reliance on a court order or legislative authorization shall constitute a complete defense to any civil or criminal action brought under this chapter or under any other law.

MR. JUSTICE POWELL, with whom THE CHIEF JUSTICE, MR. JUSTICE BLACKMUN, and MR. JUSTICE REHNQUIST join, concurring in part and dissenting in part.

I agree with the majority that the authorization by the Executive Assistant to the Attorney General of the application for the October 16 interception order contravened 18 U. S. C. § 2516 (1) and that the statutory remedy is suppression of all evidence derived from interceptions made under that order. I therefore join Parts I, II, and III of the opinion of the Court. For the reasons stated below, however, I dissent from the Court's conclusion, stated in Part IV of its opinion, that evidence

obtained under the two "pen register"[1] extension orders and under the November 6 extension of the interception order must also be suppressed.

These are the pertinent facts. On October 8, 1970, the Chief Judge of the United States District Court for the District of Maryland authorized the use of a pen register device to monitor and record for a 14-day period all numbers dialed from a telephone listed to respondent Giordano. There is no dispute that the pen register order was based on probable cause and was therefore lawful under the Fourth Amendment. On October 16, 1970, the District Court issued an order authorizing the interception of wire communications to and from Giordano's telephone for a period not to exceed 21 days. There is likewise no dispute that the wiretap order was based on probable cause. The defect in the application for this order was not the strength of the Government's showing on the merits of its request but the authorization of the application by the Executive Assistant to the Attorney General rather than by one of the officials specifically designated in 18 U. S. C. § 2516 (1). As a result of this procedural irregularity both the contents of communications intercepted under the October 16 wiretap order and any "evidence derived therefrom" must be suppressed. 18 U. S. C. §§ 2515 and 2518 (10)(a).

The authorization for use of the pen register device was extended by orders dated October 22 and Novem-

---

[1] A pen register is a mechanical device attached to a given telephone line and usually installed at a central telephone facility. It records on a paper tape all numbers dialed from that line. It does not identify the telephone numbers from which incoming calls originated, nor does it reveal whether any call, either incoming or outgoing, was completed. Its use does not involve any monitoring of telephone conversations. The mechanical complexities of a pen register are explicated in the opinion of the District Court. 340 F. Supp. 1033, 1038–1041 (Md. 1972).

ber 6, 1970. On the latter date the District Court also extended the intercept authority for a maximum additional period of 15 days. All three extension orders were based in part, *but only in part,* on evidence obtained under the invalid wiretap order of October 16. The wiretap extension order, unlike the original intercept order, was not marred by the defect of improper authorization.

The Government contends that, putting aside all evidence derived from the invalid original wiretap order, the independent and untainted evidence submitted to the District Court constituted probable cause for issuance of both pen register extension orders and the wiretap extension order, and in the latter case also satisfied the additional requirements imposed by 18 U. S. C. § 2518 (3).[2] Preoccupied with the larger issues in the case, the District Court summarily dismissed this contention insofar as it related to the pen register extension orders:

"The subsequent extension orders are not supported by sufficient showings of probable cause,

---

[2] Under 18 U. S. C. § 2518 (3), the court is required to make the following determinations:

"(a) there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in section 2516 of this chapter;

"(b) there is probable cause for belief that particular communications concerning that offense will be obtained through such interception;

"(c) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous;

"(d) there is probable cause for belief that the facilities from which, or the place where, the wire or oral communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person."

however, for the reason that information was used to obtain those extension orders from a Title III wiretap which, for reasons appearing later in this opinion, was defective. The 'fruit of the poisonous tree' doctrine requires the suppression of all pen register information obtained under the subsequent orders. Nardone v. United States, 308 U. S. 338 . . . (1939); 18 U. S. C. § 2518 (10)(a)." 340 F. Supp. 1033, 1041 (Md. 1972).

The Court of Appeals did not mention the point. 469 F. 2d 522 (CA4 1972).

With respect to the wiretap extension, neither the District Court nor the Court of Appeals addressed the Government's contention that communications intercepted under the extension were not derivatively tainted by the improper authorization defect in the original wiretap order, and neither court made any finding on this contention. The District Court simply found the wiretap extension order invalid on a different ground applicable both to the extension and to the original order. Specifically, the court concluded that the original wiretap order was unlawful because the application for it misidentified the approving officer and therefore failed to comply strictly with the provisions of 18 U. S. C. §§ 2518 (1)(a) and (4)(d). The misidentification problem occurred in the application for the original wiretap order *and* in the application for the wiretap extension. The District Court held the extension order invalid on that basis alone and ordered the evidence obtained pursuant thereto suppressed for that reason.[3] The Court of

---

[3] Immediately after stating its conclusion that the misidentification problem required suppression, the District Court made its sole reference to the November 6 extension order:

"The application and order relating to the extension of the wire-

Appeals affirmed on a different ground entirely. It held
the original order invalid because the application for it
had been approved by the Executive Assistant to the
Attorney General rather than by one of the officials
designated in 18 U. S. C. § 2516 (1). The defect of
improper authorization, unlike the misidentification
problem, arose *only* in connection with the original wire-
tap order. Perhaps through simple oversight, the Court
of Appeals failed to consider the fate of the evidence
obtained under the extension. Thus neither of the lower
courts ruled on the derivative evidence question.

Today we affirm the suppression of evidence obtained
under the original wiretap order for the same reason
adopted by the Court of Appeals—the defect of improper
authorization. As noted above, this defect did not occur
in the application for the wiretap extension order.
Today we also hold that misidentification of the approv-
ing authority does not render inadmissible evidence ob-
tained pursuant to a resulting interception order. *United
States* v. *Chavez, post,* p. 562. This decision removes the
sole basis advanced by the District Court for suppressing
the telephone conversations intercepted under the wiretap
extension order and requires us to consider whether that
evidence should be suppressed by reason of the improper
authorization of the application for the original order.
In doing so it is important to note that we are the first
court to consider this aspect of the case.

The majority holds that the invalidity of the original
wiretap order requires suppression of all evidence

---

tap are defective for the same reasons as the original application
and order." 340 F. Supp., at 1060.

Plainly, this reference to the "same reasons" concerns the failure
to comply literally with §§ 2518 (1) (a) and (4) (d) identification
requirement and has nothing to do with any derivative-evidence
rule.

obtained under the three extension orders. In my view the application to this case of well-established principles, principles developed by the courts to effectuate constitutional guarantees and adopted by Congress to effectuate the statutory guarantees of Title III, demonstrates that the majority's conclusion is error. As will appear, the same analysis governs all three extension orders, but it may clarify my position to deal with the two pen register extension orders in Part I, below, and to reserve discussion of the November 6 extension of the wiretap for Part II.

I

The installation of a pen register device to monitor and record the numbers dialed from a particular telephone line is not governed by Title III. This was the conclusion of the District Court in the instant case and of the courts in *United States* v. *King*, 335 F. Supp. 523, 548–549 (SD Cal. 1971), and in *United States* v. *Vega*, 52 F. R. D. 503, 507 (EDNY 1971). This conclusion rests on the fact that the device does not hear sound and therefore does not accomplish any "interception" of wire communications as that term is defined by 18 U. S. C. § 2510 (4)—"the *aural* acquisition of the *contents* of any wire or oral communication through the use of any electronic, mechanical, or other device" (emphasis added). Any doubt of the correctness of this interpretation is allayed by reference to the legislative history of Title III. The Report of the Senate Committee on the Judiciary in discussing the scope of the statute explicitly states "[t]he use of a 'pen register,' for example, would be permissible." S. Rep. No. 1097, 90th Cong., 2d Sess., 90 (1968).

Because a pen register device is not subject to the provisions of Title III, the permissibility of its use by law enforcement authorities depends entirely on com-

pliance with the constitutional requirements of the Fourth Amendment.[4] In this case the Government secured a court order, the equivalent for this purpose of a search warrant, for each of the two extensions of its authorization to use a pen register. The District Court seemed to assume that because these extension orders were based in part on tainted evidence, information obtained pursuant thereto must necessarily be suppressed under the "fruit of the poisonous tree" doctrine. 340 F. Supp., at 1041. That is not the law.

The District Court relied on *Nardone* v. *United States,* 308 U. S. 338 (1939). In that decision the Court held that a statutory prohibition of unlawfully obtained evidence encompassed derivative evidence as well. But the Court also reaffirmed that the connection between unlawful activity and evidence offered at trial may become "so attenuated as to dissipate the taint," *id.,* at 341, and that facts improperly obtained may nevertheless be proved if knowledge of them is based on an independent source. *Ibid.* In its constitutional aspect, the principle is illustrated by *Wong Sun* v. *United States,* 371 U. S. 471 (1963). It is, in essence, that the derivative taint of illegal activity does not extend to the ends of the earth but only until it is dissipated by an intervening event. Of course, the presence of an independent source would always suffice.

The independent-source rule has as much vitality in the context of a search warrant as in any other. Thus, for example, unlawfully discovered facts may serve as the basis for a valid search warrant if knowledge of them

---

[4] The Government suggests that the use of a pen register reay not constitute a search within the meaning of the Fourth Amendment. I need not address this question, for in my view the constitutional guarantee, assuming its applicability, was satisfied in this case.

is obtained from an independent and lawful source. See, e. g., *Anderson* v. *United States,* 344 F. 2d 792 (CA10 1965). The obvious and well-established corollary is that the inclusion in an affidavit of indisputably tainted allegations does not necessarily render the resulting warrant invalid. The ultimate inquiry on a motion to suppress evidence seized pursuant to a warrant is not whether the underlying affidavit contained allegations based on illegally obtained evidence, but whether, putting aside all tainted allegations, the independent and lawful information stated in the affidavit suffices to show probable cause. *James* v. *United States,* 135 U. S. App. D. C. 314, 315, 418 F. 2d 1150, 1151 (1969); *United States* v. *Sterling,* 369 F. 2d 799, 802 (CA3 1966); *United States* v. *Tarrant,* 460 F. 2d 701, 703–704 (CA5 1972); *United States* v. *Koonce,* 485 F. 2d 374, 379 (CA8 1973); *Howell* v. *Cupp,* 427 F. 2d 36, 38 (CA9 1970); *Chin Kay* v. *United States,* 311 F. 2d 317, 321 (CA9 1962).[5] Judge

---

[5] All of the cases cited are directly on point. There are a few additional decisions that indirectly support the general proposition stated above. *United States* v. *Cantor,* 470 F. 2d 890 (CA3 1972), involved a defendant's claim that the Government violated his Fourth Amendment rights by refusing to disclose to him certain evidence that had been used to establish probable cause for issuance of a warrant. The court rejected that claim on the ground that there was adequate independent justification to find probable cause. *Id.,* at 893. The cases of *United States* v. *Jones,* 475 F. 2d 723 (CA5 1973), and *United States* v. *Upshaw,* 448 F. 2d 1218 (CA5 1971), stand for the proposition that the validity of a search warrant based in part on erroneous statements is determined by evaluating the sufficiency of the other allegations. Finally, *United States* v. *Lucarz,* 430 F. 2d 1051 (CA9 1970), involved a search warrant based on an affidavit containing two paragraphs that invited the magistrate to find probable cause by drawing a negative inference from the defendant's exercise of his constitutional right to the assistance of counsel. The court held the validity of the warrant was to be determined on the basis of the other allegations in the affidavit.

Weinfeld aptly stated the point in *United States* v. *Epstein,* 240 F. Supp. 80 (SDNY 1965):

> "There is authority, and none to the contrary, that when a warrant issues upon an affidavit containing both proper and improper grounds, and the proper grounds—considered alone—are more than sufficient to support a finding of probable cause, inclusion of the improper grounds does not vitiate the entire affidavit and invalidate the warrant." *Id.,* at 82.

I know of no precedent holding to the contrary.[6]

The application of this principle to the pen register extension orders is clear beyond doubt. The original pen register order was based on a showing of probable

---

[6] In fact, there are only two cases lending even colorable support to a contrary view. Both are from the Sixth Circuit, and neither can be said to contradict the general proposition stated above. In *United States* v. *Langley,* 466 F. 2d 27 (1972), the court considered the validity of a warrant issued on the basis of information obtained in a previous warrantless search. The court held the prior search valid in large part and affirmed the validity of the warrant for the second search despite the inclusion in the affidavit of allegations based on the unlawful aspects of the first search. Although the case therefore illustrates the principle stated above, the court added the following comment: "It must be emphasized that where such tainted information comprises more than a *very minor portion* of that found in an affidavit supporting a warrant to search, the warrant must be held invalid." *Id.,* at 35 (emphasis in original). The other case is *United States* v. *Nelson,* 459 F. 2d 884 (1972), where the affidavit for a search warrant relied on information derived from two prior warrantless searches. Although the court suggested several reasons for suppressing the evidence seized pursuant to the warrant, the principal basis seems to have been the finding that the untainted allegations did not constitute probable cause. Thus neither case contradicts the decisions of the District of Columbia, Third, Fifth, Eighth, and Ninth Circuits cited in the text.

cause made prior to, and therefore undeniably independent of, the invalid wiretap. The affidavit supporting the first extension of the pen register order incorporated the allegations contained in the affidavit submitted for the original order and provided the additional untainted information that Giordano had sold heroin to a narcotics agent on October 17, 1970. The affidavit for the second extension of the pen register order is not included in the record, but there is no reason to doubt that it made a similar incorporation by reference of the earlier, untainted allegations. I would hold the evidence obtained under the first pen register extension order admissible and remand the case for determination of whether evidence obtained under the second extension should be admitted as well.

The basis for the majority's conclusion to the contrary is far from apparent. In the final footnote to its opinion, the Court states that the evidence obtained under the defective original wiretap order "should be considered a critical element in extending the pen register authority." The majority does not suggest, however, that the original pen register order was based on anything less than probable cause. Nor does it deny that the affidavit supporting the extension of the pen register authority fully incorporated the earlier untainted allegations. And, finally, the majority does not contradict the established principle that a warrant based on an affidavit containing tainted allegations may nevertheless be valid if the independent and lawful information stated in the affidavit shows probable cause. In light of these significant silences, the majority's bare assertion that the tainted evidence obtained under the original wiretap order was a "critical element" in the extension of the pen register authority is, to me, an unexplained conclusion—not a rationale.

## II

Unlike the pen register extensions, the wiretap extension order of November 6 is governed by Title III. The provisions of that statute prescribe an elaborate procedure for the lawful interception of wire communications. To the extent that the statutory requirements for issuance of an intercept order are nonconstitutional in nature, the exclusionary 'rule adopted to effectuate the Fourth Amendment does not pertain to their violation. The statute, however, contains its own exclusionary rule, 18 U. S. C. § 2518 (10)(a), and the scope of the suppression remedy is defined by 18 U. S. C. § 2515 to include derivative evidence:

> "Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial . . . ."

The obvious and familiar model for the statutory ban on the use of derivative evidence was the constitutional doctrine of the "fruit of the poisonous tree," and the legislative history confirms that Congress intended the phrase "no evidence derived therefrom" to incorporate that doctrine and render it applicable to certain statutory violations of nonconstitutional dimensions. The Senate Report makes the point explicitly:

> "[Section 2515] largely reflects existing law. It applies to suppress evidence directly (*Nardone* v. *United States*, 302 U. S. 379 (1937)) or indirectly obtained in violation of the chapter. (*Nardone* v. *United States*, 308 U. S. 338 (1939).) There is, however, no intention to change the attenuation rule. See *Nardone* v. *United States*, 127 F. 2d 521 (2d), cert. denied, 316 U. S. 698 (1942); *Wong Sun*

v. *United States*, 371 U. S. 471 (1963)." S. Rep.
No. 1097, 90th Cong., 2d Sess., 96.

Thus, although the validity of a wiretap order depends
on the satisfaction of certain statutory conditions in
addition to the constitutional requirement of probable
cause, the principle developed in Part I of this opinion is
fully applicable to the November 6 wiretap extension
order. The question is not whether the application for
that order relied in part on communications intercepted
under the invalid original order but whether, putting
aside that tainted evidence, the independent and lawful
information stated in the supporting affidavit suffices to
show both probable cause and satisfaction of the various
additional requirements of Title III.[7]    *United States* v.

---

[7] The majority" seems to believe that this principle, while fully
applicable to original wiretap orders, is wholly inapplicable to ex-
tension orders. This, at least, is the most reasonable construction of
the majority's discussion of §§ 2518 (1) (e) and (f). *Ante*, at 532–533.
Those provisions require that an application for an extension order
include "a full and complete statement of the facts concerning all
previous applications" and "a statement setting forth the results
thus far obtained from the interception . . . ." According to the
majority, the fact that law enforcement authorities complied with
§§ 2518 (1) (e) and (f) by including in the application for the exten-
sion order information regarding the earlier wiretap necessarily and
automatically rendered the extension order invalid, *regardless* of
whether the independent and untainted information in the application
for the extension satisfied the requirements of the Fourth Amendment
and § 2518 (3).

With all respect, I find this a baffling interpretation of the statute.
Certainly there is nothing in the language or history of §§ 2518 (1) (e)
and (f) to suggest that Congress intended these provisions to except
all extension orders from the independent-source doctrine. Nor
is there any suggestion in the language or history of § 2515, which
is the statutory analogue to the constitutional doctrine of the fruit
of the poisonous tree, that Congress intended to distinguish between
original wiretap orders and extension orders in determining the extent
of the suppression remedy. Finally, there is nothing in logic

*Iannelli,* 339 F. Supp. 171 (WD Pa. 1972) ; *United States v. Ceraso,* 355 F. Supp. 126 (MD Pa. 1973).

The application for the wiretap extension order was supported by the affidavit of a group supervisor from the Bureau of Narcotics and Dangerous Drugs. The same officer had sworn to one of two affidavits submitted in support of the application for the original wiretap order. The other had been filed by a narcotics agent acting under his supervision and stated facts within their joint knowledge. In the affidavit for the extension order, the supervisor swore that he had reviewed both of the earlier affidavits, and he "reassert[ed] the facts, details and conclusions contained in those affidavits." App. 66. Those allegations not only established probable cause to believe that Giordano was engaged in the illegal sale and distribution of narcotics on a fairly substantial scale, 18 U. S. C. § 2518 (3)(a), they also satisfied the additional statutory criteria for issuance of an intercept order. They showed, for example, that Giordano had made numerous telephone calls to numbers listed to well-known narcotics violators and hence that there was probable cause to believe that communications concerning the illegal drug traffic were taking place on Giordano's telephone line. See 18 U. S. C. §§ 2518 (3)(b) and (d). The affidavits also established the inadequacy of alternative investigative means and demonstrated that without a wiretap of Giordano's telephone the narcotics agents would be unable to discover his source of supply or method of distribution. See 18 U. S. C. § 2518 (3)(c). All this was shown on the basis of wholly untainted evidence incorporated and reaffirmed in the affidavit sup-

---

to indicate why Congress would have wanted to make such a distinction, and there is no basis in reason to suppose that Congress, if it had intended such a result, would have failed to leave any evidence of that intent.

porting the Government's request for the wiretap extension order.

The affidavit also provided additional untainted information to support the application for the extension order. It set forth, for example, the circumstances of Giordano's sale of $3,800 worth of heroin to an undercover agent on the day following issuance of the original wiretap order. Moreover, it recounted in great detail highly suspicious conduct observed by federal agents keeping Giordano under physical surveillance.[8] Like the allegations incorporated by reference from the earlier affidavits, this additional untainted information was relevant both to the constitutional requirement of probable cause and to the various statutory criteria for issuance of an intercept order. 18 U. S. C. § 2518 (3).

In light of the substantiality and detail of the untainted allegations offered in support of the application for the wiretap extension order, I find no basis for the majority's rather summary conclusion that the communications intercepted under that extension order were derivatively tainted by the improper authorization of the application for the original wiretap order. Because neither the District Court nor the Court of Appeals has considered this question, I would remand the case with instructions that the issue be settled in accord with the principles set forth in this opinion.

---

[8] The detailed information lawfully obtained through surveillance and undercover work was aptly summarized in ¶ 77 of the affidavit supporting the extension order:

"Giordano exhibits the characteristics of a high-level narcotics trafficker—extreme caution. When travelling, he continually uses various counter-surveillance techniques. In his transactions, he limits his contacts to a small number of trusted individuals." App. 81.