[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 09-14444

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JANUARY 31, 2011
JOHN LEY
CLERK

D. C. Docket No. 05-20916-CR-WPD

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ALFONSO ALLEN,
a.k.a. Spoon,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(January 31, 2011)

Before CARNES, FAY and SILER,* Circuit Judges.

_____

*Honorable Eugene E. Siler, Jr., United States Circuit Judge for the Sixth Circuit, sitting
by designation.

PER CURIAM:

Alfonso Allen ("Allen") appeals his convictions and sentences for conspiracy to distribute fifty or more grams of cocaine base, in violation of 21 U.S.C. § 841(a)(1), all in violation of 21 U.S.C. § 846 (Count 1), distribution of cocaine base, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Counts 8 and 9), possession with intent to distribute cocaine base, in violation of 18 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Count 10), possession of firearms in furtherance of a drug trafficking crime, as set forth in Count 10, all in violation of 18 U.S.C. § 924(c)(1)(A) and 18 U.S.C. § 2 (Count 11), knowing possession of a firearm as a convicted felon, in violation of 18 U.S.C. § 922(g)(1) and 18 U.S.C. § 2 (Count 12), and knowing possession of a firearm which was not registered to him in the National Firearms Registration Record, in violation of 26 U.S.C. § 5861(d) and 18 U.S.C. § 2 (Count 13).

Allen raises several issues on appeal. First, he argues the district court erred in denying his motion to suppress evidence obtained from intercepted wiretap communications and evidence obtained from the warrantless search of his cell phone. Second, he argues the district court erred in denying his *Batson* challenge to the government's peremptory striking of two African-American jurors. Third, he argues the district court abused its discretion by finding the government's filing of a 21

2

U.S.C. § 851 information was not vindictive in nature. After careful review of the record, counsels' briefs, and the benefit of oral argument, we affirm the district court.

## I. BACKGROUND

Cornell Roberts and Andrew Haynes operated a drug distribution organization in the Overtown neighborhood of Miami, Florida. Roberts and Haynes used an apartment they dubbed "the Mint" to convert powder cocaine into crack cocaine, which they then sold in a stairwell at the Rainbow Towers apartment complex. In December 2003, the organization set up another crack cocaine factory called "the Rolex" in an apartment leased by Roberts' sister. The Cornell Roberts crack cocaine organization employed an extensive network to further its nefarious business, including lieutenants, enforcers, sellers and lookouts. Appellant Alfonso Allen, also known as "Spoon," was a lieutenant who set up the sellers at the beginning of their shifts at the Rainbow Towers with small "baggies" of crack cocaine marked with green dollar signs. Several times during each shift, Allen picked up the sellers' cash proceeds and replenished their crack cocaine supplies, keeping track of each seller's cash receipts and crack cocaine allotments on tally sheets.

On July 11, 2006, a joint task force investigating the Cornell Roberts organization began a court-authorized wiretap on Roberts' Metro PCS cell phone. After Roberts discarded his Metro PCS cell phone, the task force began another court-

authorized wiretap on August 11, 2005 through September 11, 2005 of Roberts' other cell phone. During this period of time, Allen was recorded reporting to Roberts on numerous occasions. The contents of the recordings included, among other things, Allen reporting to Roberts concerning Allen's collection of monies from the sellers, shortages of cash or crack, problems with crack cocaine production, updates on police surveillance, and Allen explaining to Roberts how he was able to successfully convince competing crack cocaine sellers to stop selling their product at Rainbow Towers, thus avoiding violence and police involvement which would hamper the continuing sales of their crack cocaine.

On August 17, 2005, officers monitoring the wiretap learned that Allen was planning to meet with Roberts in Miami, Florida. Detectives conducted a computer driver's license search to obtain a photograph of Allen and discovered that Allen's driver's license had been suspended. Detectives Suarez and Tillman intercepted Allen while he was driving to the planned meeting and arrested him for driving with a suspended license. While conducting an inventory search of Allen's vehicle, prior to having it towed to the pound, Detective Suarez noticed what looked like a marijuana cigarette in the ash tray of the front passenger seat. Detective Suarez also found a Western Union order for a cell phone payment in the backseat and noticed that the phone number on the bill was the same as the one being wiretapped.

4

Detective Tillman then searched Allen's person and removed from his pockets the following items: (1) a cell phone; (2) a wallet; and (3) a wad of cash. These items were placed on the hood of Allen's vehicle. As Allen was being searched, ATF Agent DeVito arrived on the scene. After Allen was moved away from his vehicle, Agent DeVito picked up Allen's cell phone from the hood of the vehicle, flipped it open, and began scrolling through the telephone numbers in the contact list. Recognizing some of the numbers on the list, Agent DeVito copied the familiar-looking numbers onto a piece of scrap paper and later included them in his report. Agent DeVito then closed the phone and placed it inside Allen's vehicle. Agent DeVito also found a tally sheet folded up in Allen's wallet, which noted narcotics transactions by persons in Roberts' organization, identifiable on the tally sheet by initials for their names or nicknames.

On September 9, 2005, the task force officers executed a search warrant on the apartment known as "the Rolex" within the Cornell Roberts organization. During the search, a police officer stationed at the rear of the building observed Allen intentionally jump, head-first, out of a second floor window and land on the ground in front of him. Appearing stunned but uninjured, Allen was taken into custody. The officers searching the apartment found firearms (a sawed-off 12 gauge shotgun and loaded semi-automatic pistol), ammunition, various drug tally sheets (including

5

several marked "Sp"), a wallet belonging to co-conspirator Kareem Roberts, baggies of powder cocaine and marijuana, beakers and plates caked with crack cocaine residue, baking soda, baggies marked with a dollar signs, currency, razor blades used to cut crack cocaine "cookies", electronic scales, and scraps of paper covered with phone numbers. In addition, Allen's identification card and a copy of the police report of Allen's August 17, 2005 arrest were also found in the living room.

On July 18, 2006, a federal grand jury in the Southern District of Florida returned a second superseding indictment charging Allen with conspiracy to distribute fifty or more grams of cocaine base, in violation of 21 U.S.C. § 841(a)(1), all in violation of 21 U.S.C. § 846 (Count 1), distribution of cocaine base, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Counts 8 and 9), possession with intent to distribute cocaine base, in violation of 18 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Count 10), possession of firearms in furtherance of a drug trafficking crime, as set forth in Count 10, all in violation of 18 U.S.C. § 924(c)(1)(A) and 18 U.S.C. § 2 (Count 11), knowing possession of a firearm as a convicted felon, in violation of 18 U.S.C. § 922(g)(1) and 18 U.S.C. § 2 (Count 12), and knowing possession of a firearm which was not registered to him in the National Firearms Registration Record, in violation of 26 U.S.C. § 5861(d) and 18 U.S.C. § 2 (Count 13). The indictment also charged eleven co-defendants with conspiracy to distribute fifty or more grams

of cocaine base in Count 1, and variously charged them with other offenses similar to Allen.

After his arrest, Allen adopted motions to suppress the intercepted wiretap communications filed by his co-defendants. Following a hearing, the district court denied the motions. Allen also filed a motion to suppress the physical evidence seized during his August 17, 2005 arrest which the district court also denied. At trial, Allen moved to withdraw his plea of not guilty, and with the district court's approval, entered a plea of guilty as to Counts 1 and 11, pursuant to a written agreement with the United States. Two months later, on December 19, 2006, Allen sought to discharge his counsel and moved to withdraw his guilty plea. The district court denied Allen's motion and on January 26, 2007, sentenced Allen on Count 1 to 360 months of imprisonment, followed by 120 months imprisonment on Count 11, to run consecutively. Following his imprisonment, Allen would be subject to supervised release for five years and specially assessed $200.

Allen appealed his sentence, and on February 3, 2009, this Court vacated Allen's guilty plea and conviction and remanded the case with instructions to assign another district court judge. Allen renewed his motions to suppress the physical evidence from his August 17, 2005 arrest and the intercepted wiretap communications. The district court denied all of Allen's motions. On April 16, 2009,

7

the government filed an information pursuant to 21 U.S.C. § 851 disclosing its intent to use evidence regarding narcotics convictions at sentencing.

On June 9, 2009, jury selection commenced for Allen's trial. During *voir dire*, the government used peremptory challenges on jurors 12, 13, and 14. Allen raised separate *Batson*[1] challenges to the striking of jurors 13 and 14, noting that they were African-American. Regarding the first *Batson* challenge, the district court asked the government why it chose to use a peremptory challenge on juror 13. The government responded that the juror was rolling her eyes repeatedly during examination, not paying attention, putting on make-up during questioning, and that her sister had been arrested for traffic violations. Regarding the government's use of a peremptory challenge to strike juror 14, the government responded that juror 14 had an aunt who had been arrested for drug trafficking. The district court denied Allen's *Batson* challenges to jurors 13 and 14, holding that the jurors had been struck on proper race neutral grounds.

On June 17, 2009, Allen's trial concluded and the jury returned verdicts convicting Allen as charged. Allen filed a motion to strike the government's 21 U.S.C. § 851 information, which the district court denied after hearing argument.

On August 25, 2009, Allen was sentenced to life imprisonment as to Count 1;

---

[1]*Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712 (1986).

360 months incarceration as to Counts 8, 9, and 10, to run concurrent with each other and with Count 1; 120 months incarceration as to Count 11, to run consecutive to Counts 1 and 8-10; and 120 months incarceration as to Counts 12 and 13, to run concurrent with each other and with Counts 1, and 8-10. This timely appeal followed.

## II. DISCUSSION

On appeal, Allen challenges the district court's denial of his motions to suppress the intercepted wiretap communications and evidence obtained from the warrantless search of his cell phone. In addition, Allen asserts that the district court erred in overruling his *Batson* challenge for the government's improper use of peremptory challenges to remove two African-American jurors, and for denying his motion to strike the government's notice of sentencing enhancement filed for vindictive purposes.

### A. *Intercepted wiretap communications*

We review the district court's denial of a motion to suppress evidence gathered via electronic surveillance under a mixed standard of review. *United States v. Malekzadeh*, 855 F.2d 1492, 1496 (11th Cir. 1988). Findings of fact are reviewed for clear error and the application of law to those facts is reviewed *de novo*. *United States v. Mercer*, 541 F.3d 1070, 1073-74 (11th Cir. 2008) (citing *United States v. Ramirez*, 476 F.3d 1231, 1235 (11th Cir. 2007)).

9

Allen argues that the government failed to show necessity for the wiretap of Cornell Roberts' cell phone and failed to exhaust all other investigative procedures, as required by 18 U.S.C. § 2518. The provision on which Allen relies states that an application for interception of wire communications must contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(c)(1). The statute authorizing wiretaps is not intended "to be routinely employed as the initial step in a criminal investigation," *United States v. Giordano*, 416 U.S. 505, 515, 94 S. Ct. 1820, 1827 (1974), but rather, it is designed to ensure that electronic surveillance is neither routinely employed nor used when less intrusive techniques will succeed. *Id*. This does not, however, mean that the statute requires "a comprehensive exhaustion of all possible techniques, but must simply explain the retroactive or prospective failure of several investigative techniques that reasonably suggest themselves." *United States v. Van Horn*, 789 F.2d 1492, 1496 (11th Cir. 1986). Here, Allen maintains that the government did not exhaust all of its investigative procedures before seeking to wiretap Cornell Roberts' cell phone. However, 18 U.S.C. § 2518 and relevant case law do not require the government to explore every possible avenue of investigation open to it before pursuing electronic surveillance of wire communications, only those avenues which

do not reasonably appear unlikely to succeed or which are not too dangerous. Allen argues that the wiretap was not necessary because the government had not exhausted all of the other investigative avenues open to it. Specifically, Allen asserts the government could have used a cooperating confidential informant to infiltrate the Cornell Roberts organization or set up a sting operation through an undercover DEA agent Roberts had been speaking with. The government points out that these were not reasonable avenues for the government to explore at the time. Specifically, when the wiretap was applied for in July 2005, the confidential informant Allen refers to was already in jail on bank robbery charges, and a sting sale of real cocaine would not have advanced the goals of the investigation (to discover the source of Roberts' powder cocaine) since agents would have had to immediately arrest Roberts in order to prevent the cocaine from entering the stream of commerce, thus shutting down the investigation. Based upon these facts, we find no error in the district court's denial of Allen's motion to suppress the intercepted wiretap communications.

### B.     *Warrantless search of cell phone*

Allen asserts that the district court erred in denying his motion to suppress evidence improperly obtained during his August 17, 2005 arrest. Specifically, Allen argues that the warrantless search of his cell phone contact list, once he was already secured by the arresting officers and could no longer access his cell phone, violated

his Fourth Amendment expectation of privacy.

Whether the warrantless search of a cell phone incident to arrest violates a person's Fourth Amendment expectation of privacy is an unanswered question in this Circuit. It is a fairly difficult question, however, it is also a question that we need not answer today. The law is clear that potential Fourth Amendment violations are subject to a harmless error analysis, and we find that the facts here are equally clear that any error would be harmless. *United States v. Khoury*, 901 F.2d 948, 960 (11th Cir. 1990). "The error is harmless if there is no 'reasonable probability that the evidence complained of might have contributed to the conviction.'" *United States v. Turner*, 871 F.2d 1574, 1581-82 (11th Cir. 1989) (quoting *Fahy v. Connecticut*, 375 U.S. 85, 86-87 (1963)). Factors the court may consider regarding whether the evidence is harmless include: the importance of the evidence to the prosecution, whether the evidence was cumulative, and the overall strength of the prosecution's case. *Turner*, 871 F.2d at 1582.

Excluding the contact list obtained from the warrantless search of Allen's cell phone, there was overwhelming evidence of Allen's guilt. Allen was observed by an officer on the scene jumping head-first out of a second story window as police executed a search warrant on the apartment he was in, revealing a 12 gauge sawed-off

12

shotgun, a loaded semi-automatic pistol, ammunition, various drug tally sheets marked "Sp" for "Spoon" (Allen's nickname), baggies of powder cocaine and marijuana, beakers and plates caked with crack cocaine residue, baking soda, baggies marked with green dollar signs, currency, razor blades used to cut crack cocaine "cookies, electronic scales, scraps of papers covered with telephone numbers, Allen's identification card, and a copy of the police report from Allen's August 17, 2005 arrest. Allen was recorded on the Roberts' wiretap explaining to Roberts that he did not take the pistol when he jumped from the second story window because he was concerned about getting out of the apartment. Allen was further recorded numerous times discussing with Roberts his collection of money from the crack sellers, the sellers' shortages of cash and crack cocaine, problems with crack cocaine production, lazy and dishonest sellers, and police surveillance. In addition, in one wiretap conversation with Roberts, Allen identified himself as Spoon and bragged to Roberts about how he had persuaded competing drug sellers to stop selling at Rainbow Towers without resorting to violence and avoiding any police involvement. Allen was also recorded telling Roberts where the guns were hidden in the Rolex apartment so Roberts could procure one for his own use.

Furthermore, Allen's incriminating statements were corroborated by co-conspirator testimony at trial and police observations that Allen was a lieutenant

13

within the Cornell Roberts crack cocaine organization. This voluminous evidence established clearly that Allen's duties where to set up sellers at the beginning of their shifts at the Rainbow Towers with crack cocaine baggies marked with green dollar signs, pick up sales proceeds and replenish crack cocaine supplies, record each seller's sales data on tally sheets, and pay the sellers in cash at the end of their shifts. The evidence further established that the lieutenants, the bosses, and the sellers all carried firearms for protection, that pistols were stored at the Rolex, and that a shotgun was left at the Rolex to deter any potential robbers.

The contact list from Allen's cell phone was entered into evidence to show Allen was linked to Cornell Roberts and his co-conspirators and to illustrate the connection between Allen and three street level distributors who had not been recorded during the wiretap, but whose phone numbers did appear on the contact list. However, in light of the abundance of other incriminating evidence – including recordings of Allen speaking to Roberts, testimony from his co-conspirators, and evidence obtained during the search of the Rolex – the contents of Allen's cell phone contact list added little to nothing in proving that Allen was an integral part of the Cornell Roberts crack cocaine organization. The cell phone contact list was merely a small piece of a large and complex puzzle, the absence of which would not reasonably prevent seeing the larger picture presented here. Thus, even if admission

14

of the contact list was error (a question which we do not reach), any such error was harmless.

### C. *Allen's Batson challenge*

We review jury selection *de novo* under the three-part test articulated in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712 (1986), and review the district court's underlying factual findings for clear error. *United States v. Allen-Brown*, 243 F.3d 1293, 1297 (11th Cir. 2001). In *Batson*, the Supreme Court outlined the following test to assess challenges to peremptory strikes: (1) the party challenging the peremptory strike must establish a *prima facie* case of discrimination, (2) if the court finds that a *prima facie* case of discrimination has been established, the burden shifts to the party exercising the peremptory challenge to articulate a non-discriminatory explanation for the strike, and (3) if a nondiscriminatory reason is offered, the court must determine whether the party challenging the strike has met its burden of proving purposeful discrimination. *Cent. Ala. Fair Hous. Ctr., Inc. v. Lowder Realty Co., Inc.*, 236 F.3d 629, 636 (11th Cir. 2000). "A district court's finding as to why a juror is excused is an issue of fact, and as such, it will not be disturbed on appeal 'unless it is clearly erroneous or appears to have been guided by improper principles of law.'" *Allen-Brown*, 243 F.3d at 1297.

Allen argues that the district court erred in denying his *Batson* challenge to the government's peremptory strikes of two African-American jurors. The government responds that the two African-American jurors were struck for race neutral reasons: inattentiveness and close family members who had been arrested. Allen maintains that the government's peremptory striking of these two prospective jurors was motivated by race because the government did not strike two white jurors who also had family members who had been arrested.

Applying the *Batson* three-part test, it is clear that even if Allen can establish a *prima facie* case for discrimination, Allen cannot satisfy the second and third prongs of the test. The government has provided an acceptable race-neutral, nondiscriminatory explanation for its striking of the jurors. Specifically, juror 13 was inattentive and had a sister who had been arrested for an unspecified traffic violation. Juror 14 had an aunt who had been arrested for drug trafficking, the same crime for which Allen was being tried. Finally, applying the third *Batson* prong, Allen has not proved the government purposefully discriminated in using their using peremptory strikes to remove them. Accordingly, we find no error.

D.     *Vindictive filing of government's 21 U.S.C. § 851 information*

"[T]he dismissal of an indictment on the ground of prosecutorial misconduct is a discretionary call; we therefore review the court's action for an abuse of

discretion." *United States v. Barner*, 441 F.3d 1310, 1315 (11th Cir. 2006) (citations omitted). "A district court abuses its discretion if, in making the decision at issue, it applies the incorrect legal standard or makes findings of fact that are clearly erroneous." *Id.* (quoting *United States v. Jordan*, 316 F.3d 1215, 1249. (11th Cir. 2003)).

Allen argues that the government's filing of a 21 U.S.C. § 851 information, listing prior convictions which would possibly subject Allen to a sentence of life imprisonment, was filed in retaliation for his successful appeal to vacate his earlier guilty plea. However, we can find no vindictive conduct on the government's behalf. In fact, the government went so far as to extend the same plea agreement to Allen on remand that Allen had initially agreed to, even offering to refrain from filing the 21 U.S.C. § 851 information. Defense counsel informed Allen of the risks involved in refusing the plea agreement and explained to him that once the information was filed, Allen would be subject to a life sentence should he be convicted. Under these circumstances, it does not appear that the government's filing of a 21 U.S.C. § 851 information was vindictive; Allen simply chose not to accept the plea agreement and to take his chances at trial. The fact that the trial did not turn out favorably for him and that he is now facing a life sentence does not render the government's actions vindictive in nature. Allen is merely facing the consequences of his actions.

17

Accordingly, we find that the district court committed no error in denying Allen's motion to strike the government's 21 U.S.C. § 851 information.

For the foregoing reasons, we **AFFIRM**.