[Cite as *State v. Fisk*, 2021-Ohio-1973.]

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee/Cross-Appellant | : | Appellate Case No. 28798 |
| | : | |
| | : | Trial Court Case No. 2019-CR-2718 |
| v. | : | |
| | : | (Criminal Appeal from |
| ZACARY L. FISK | : | Common Pleas Court) |
| | : | |
| Defendant-Appellant/Cross-Appellee | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 11th day of June, 2021.

. . . . . . . . . . .

MATHIAS H. HECK, JR. by ANDREW T. FRENCH, Atty. Reg. No. 0069384, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee/Cross-Appellant

STEPHEN P. HARDWICK, Atty. Reg. No. 0062932, Assistant Ohio Public Defender, 250 East Broad Street, Suite 1400, Columbus, Ohio 43215
    Attorney for Defendant-Appellant/Cross-Appellee

. . . . . . . . . . . .

EPLEY, J.

{¶ 1} Defendant-Appellant Zacary L. Fisk was found guilty by a jury of two counts of felonious assault. After merging the offenses, the trial court sentenced Fisk to an indefinite term of two to three years in prison. On appeal, Fisk argues that the trial court erred by not allowing him to present evidence of the victim's alleged past violent acts in support of his self-defense claim. The State has filed a cross-appeal in which it contends that the trial court erred when it did not order restitution to the victim. For the reasons that follow, the trial court judgment will be affirmed.

## I.        Facts and Procedural History

{¶ 2} In August 2019, Steven Patton lived at 1212 Old Main Street in Miamisburg, a three-bedroom home he shared with his fiancée Cyrena Brown, their daughter Casey Patton, and Cindy Wood, Brown's mother. In addition, from time-to-time, Brown's then-19-year-old son from a previous relationship, Defendant Zacary Fisk, stayed there. Because all the bedrooms were taken, Fisk had a makeshift room in the garage.

{¶ 3} On August 15, 2019, Patton arrived home from work around 9 a.m. He was sitting on the couch watching television when Fisk asked him to go out to the garage because Fisk had a "surprise" for him. Patton was not concerned because Fisk was smiling, and Patton figured it was a belated birthday present.

{¶ 4} Patton entered the garage followed by Fisk. Patton noticed that it was unusually dark, but that did not raise any concerns, and similarly, red flags were not raised when Fisk requested that he close his eyes. The next thing Patton knew, he was hit in the back of the head with a hammer and was on the ground. After getting his senses back, Patton noticed that his right arm was covered with blood. He then realized that he was

being attacked by Fisk and that Fisk had a knife.

{¶ 5} A brawl ensued. Patton testified that while the two were wrestling for control of the knife, Fisk continued to "drill the knife" at him. Eventually, Patton managed to dispossess the weapon from Fisk, and he tossed it to another part of the garage so Fisk could not inflict any more injuries.

{¶ 6} With the knife out of reach, Patton tried to escape. He could not open the door, though, because his hands were covered with blood, and the slippery nature of his skin made it too difficult to turn the knob. Patton's inability to leave the garage gave Fisk the opportunity to mount a second attack. This time, Fisk tackled him from behind, and the two landed on a couch. Now with scissors in hand, Fisk attacked Patton further, stabbing him with the new weapon.

{¶ 7} Once again, Patton was able to disarm Fisk. Patton testified that after the scissors were removed from the skirmish, he was able to turn the tables. Patton grabbed Fisk by the neck and punched him in the face several times, causing him to abandon the assault. Patton was then able to escape.

{¶ 8} Dazed and losing blood, Patton made his way through the house and onto the porch, where he called 911. Miamisburg Police Officer Megan Slupe was the first on scene after receiving a call of a stabbing and a warning that the suspect was still in the house. When she arrived, Patton was "saturated with blood from the top of his head all the way down," and Officer Slupe testified that Patton had a difficult time making his way to her due to his injuries. Officer Slupe observed stab wounds to Patton's arms, neck, and head. Officer Brandon Mundy, who arrived soon after Officer Slupe, testified that when he pulled up, the first thing he noticed was a male sitting on the porch covered in blood.

{¶ 9} Patton was taken by ambulance to Kettering Medical Center where he was treated by trauma surgeon Dr. Steven Santanello. Dr. Santanello testified that when Patton arrived in the emergency room, he had multiple stab wounds and blood about his face, chest, and belly. The doctor considered these life-threatening injuries and was particularly concerned about the neck wound and the stab wound to Patton's left flank (the side of the abdomen).

{¶ 10} After an initial assessment, Patton was taken to surgery to determine the severity of his abdominal wound. The operation discovered a laceration to his colon, but by and large, Patton's vital organs escaped major damage. The next focus was the neck wound. Doctors again endeavored on an exploratory surgery which, this time, determined there was damage to Patton's salivary gland, but his vascular structures, trachea and esophagus were found to be unscathed. In addition to the internal damage, Patton was treated for superficial lacerations to his hands, fingers, and arms. Patton testified that he was in the hospital for roughly a week and was out of work for a month because of the attack.

{¶ 11} After Patton was transported to the hospital, Officer Mundy turned his attention to Fisk, who was still in the garage. Officer Mundy began giving commands with his cruiser's bullhorn for Fisk to exit the garage. Other officers soon arrived, and a perimeter was set up around the property. Officers continued to order Fisk out of the garage for over 30 minutes with no success, until finally, the garage door opened, Fisk emerged, and he was taken into custody without incident. After he was handcuffed, Fisk told officers, "He tried to kill me."

{¶ 12} Fisk was not completely uninjured in the altercation and was transported

(with an escort from Officer Mundy) by ambulance for treatment of superficial lacerations to his hands, fingers, arms, and legs. Officer Mundy testified that he almost immediately informed Fisk of his *Miranda* rights, and the two began talking. Fisk told the officer that he and Patton had gotten into a verbal altercation and then Patton "came out with a knife." Officer Mundy testified that Fisk could not tell him what they argued about but did say Fisk explained that he was able to disarm Patton thanks to "years of martial arts training."

{¶ 13} Kyle Vincent, a firefighter paramedic at the Miami Valley Fire District, was in the ambulance as well. He testified that Fisk initially told Officer Mundy that he was attacked, but "[t]hroughout the transport, he change[d] his story multiple times. And by the time we got to the hospital, he ended up saying that the victim didn't have a weapon and that he wasn't initially attacked." Trial Tr. at 523. Vincent's testimony matched what Officer Mundy told the jury – that Fisk told him Patton was unarmed for much of the altercation and that, at one point, he was on top of Patton stabbing him. When asked why he was harming an unarmed man, Fisk reportedly said, "it was life or death; and bitch, it wasn't going to be me."

{¶ 14} Fisk was treated at the hospital for superficial wounds to his right thigh, one of his fingers, his thumb, and "a laceration or abrasion" to his leg. The wounds required sutures and were non-life threatening.

{¶ 15} On August 26, 2019, Fisk was indicted on one count of attempted murder and two counts of felonious assault.

{¶ 16} Prior to the start of trial, the State filed a motion in limine, seeking to keep Fisk from introducing evidence relating to specific instances of Patton's past conduct and alleged propensity for violence. The court overruled the motion but held that "Fisk may

introduce evidence of Mr. Patton's specific instances of past violent conduct if such conduct was directed towards Fisk or if Fisk was present and observed the incidents."

{¶ 17} The jury trial began on March 2, 2020 and included testimony from eight witnesses for the State over the course of two days, including Officers Slupe and Mundy, detectives, medical personnel, forensic scientists, and Patton. Fisk did not testify and called no witnesses. His attorney argued that the State's evidence supported a self-defense claim.

{¶ 18} After deliberation, the jury found Fisk guilty of both counts of felonious assault but acquitted him on the charge of attempted murder. The court ordered a presentence investigation report and set sentencing for April 13, 2020. Both parties filed sentencing memoranda.

{¶ 19} At the sentencing hearing, the court stated that it had considered the sentencing memoranda from both sides, letters in support of Fisk, Patton's victim impact letter, and medical bills submitted by Patton. Patton also gave a victim impact statement at the hearing. The lengthy speech outlined the physical and emotional issues created by the attack, threats received from Fisk's side of the family, and the $177,179.58 medical bill that, he claimed, the Veterans Administration would not pay.

{¶ 20} Citing his lack of an adult record and familial support, the trial court sentenced Fisk to an indefinite prison term of two to three years on the merged felonious assault counts. The court then rejected Patton's $177,179.58 restitution request, stating "I need something more from the Veterans Administration relative to potential coverage, noncoverage, the reason that coverage of any kind was declined." It then advised Patton to apply to the Ohio Crime Victims Compensation Fund and/or "pursue a civil remedy,

civil action against Zacary Fisk for compensation."

**{¶ 21}** The State objected to the court's decision on restitution, noting that Patton had provided medical bills indicating the cost of medical treatment, and that it was unnecessary to provide a reason why the VA declined the coverage.

**{¶ 22}** On May 11, 2020, Fisk filed his appeal from his conviction; the State cross-appealed challenging the trial court's refusal to order restitution.

## II.  Self-defense claim

**{¶ 23}** In his lone assignment of error, Fisk claims that limiting the admission of evidence regarding Patton's alleged violent past-acts was an error by the court and negatively impacted his ability to mount a self-defense claim.

**{¶ 24}** A trial court has broad discretion to admit or exclude evidence. *State v. Issa*, 93 Ohio St.3d 49, 64, 752 N.E.2d 904 (2001). "Unless the trial court has abused its discretion, an appellate court will not disturb a trial court's decision concerning the admission of evidence." *State v. Salyers*, 2d Dist. Montgomery No. 20695, 2005-Ohio-2772, ¶ 18. "Abuse of discretion has been defined as an attitude that is unreasonable, arbitrary, or unconscionable. It is to be expected that most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary." *State v. Malloy*, 2d Dist. Clark No. 2011-CA-21, 2012-Ohio-2664, ¶ 24.

**{¶ 25}** Fisk's defense was based on his claim that he acted in self-defense. To establish self-defense, it must be established that (1) he was not at fault in creating the violent situation; (2) that he had a bona fide belief that he was imminent danger of death or great bodily harm and his only means of escape from that harm involved the use of

force; and (3) that he did not have a duty to retreat or avoid the danger. *State v. Barnes*, 94 Ohio St.3d 21, 24, 759 N.E.2d 1240 (2002).

{¶ 26} The second prong, that he had a bona fide belief that he was in imminent danger, is where Fisk focuses his argument, and he argues that his state of mind at the time of the incident was crucial. He reasons that, because he was aware of previous instances of violence in Patton's past, he was afraid, thus creating a bona fide belief that he was in imminent danger. The Rules of Evidence offer some guidance for our analysis.

{¶ 27} In general, "[e]vidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion." Evid.R. 404(a). In other words, it does not necessarily follow that because a person acted violently in the past, he acted violently in the present situation.

{¶ 28} As with many things in the law, however, there are exceptions. Evid.R. 404(a)(2)(B) provides that the accused may offer evidence of the alleged victim's character in some self-defense scenarios. One such instance is that an accused may claim that his knowledge of the alleged victim's violent character and acts contributed to his reasonable belief that the immediate use of force was necessary to protect himself. "These events are admissible in evidence, not because they establish something about the victim's character, but because they tend to show why the defendant believed the victim would kill or severely injure him." *State v. Carlson,* 31 Ohio App.3d 72, 508 N.E.2d 999 (8th Dist.1986), paragraph one of the syllabus.

{¶ 29} In this case, in response to the State's motion in limine which sought to bar all mention of Patton's past violent acts, the court held that Fisk could only introduce evidence of Patton's alleged bad acts that had been directed toward Fisk or if Fisk had

observed the incident. This ruling was an error.

{¶ 30} We have previously held that "a defendant asserting self-defense may testify about specific instances of the victim's prior violent or aggressive conduct which was known to the defendant in order to establish the defendant's state of mind." *State v. Eng*, 2d Dist. Montgomery No. 14015, 1994 WL 543277, *9 (Sept. 30, 1994). Other appellate courts have held similarly. *State v. Smith*, 10 Ohio App.3d 99, 101 460 N.E.2d 693 (10th Dist.1983) (defendant's knowledge that the victim had committed an act of violence on another party, even though that knowledge was learned through hearsay, was relevant to the defendant's belief that he was in imminent danger of death or great bodily harm); *United States v. Saenz*, 179 F.3d 686, 688-89 (9th Cir.1999) ("A defendant claiming self-defense may show his own state of mind by testifying that he knew of the victim's prior acts of violence."). As a result, we find that the trial court erred when it permitted Fisk to only introduce evidence of Patton's alleged violent acts if they were perpetrated against Fisk or observed by him. Fisk's knowledge of Patton's alleged past violent acts should have been admitted to support his self-defense claim.

{¶ 31} This result, however, does not end the inquiry, as the trial court's ruling is subject to harmless error analysis. *See Salyers* at ¶ 33 (finding the trial court's erroneous exclusion of evidence was harmless). "When performing harmless error analysis, an error is deemed harmless if it did not affect the defendant's 'substantial rights.' " *State v. Smith* 3d Dist. Logan No. 8-12-05, 2013-Ohio-746, ¶ 20, quoting Crim.R. 52(A). The Ohio Supreme Court has stated that to affect the substantial rights of the accused, "'the error must have been prejudicial: It must have affected the outcome of the court proceedings.' " *State v. Fisher*, 99 Ohio St.3d 127, 2003-Ohio-2761, 789 N.E.2d 222, ¶ 7, quoting *United*

*States v. Olano*, 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993).

{¶ 32} In this case, despite the error made by the trial court, the outcome of the trial would not have been different, and we find the court's error to have been harmless. The evidence presented clearly demonstrated that Fisk did not act in self-defense. Testimony indicated that he lured Patton into a dark garage by promising a surprise, told him to close his eyes, locked the door behind him, and then proceeded to strike Patton in the head with a hammer. Fisk then stabbed Patton repeatedly with a knife. After Patton was able to remove the knife from Fisk and toss it aside, he tried to escape. Fisk then launched another, unprovoked attack with a second weapon, this time scissors. This type of attack is not self-defense. *See also State v. Shoecraft*, 2d Dist. Montgomery No. 27860, 2018-Ohio-3920 (rejecting self-defense claim where the victim was shot in the back of the neck while driving away); *Salyers* (evidence that victim was shot in the back belies defendant's self-defense claim); *State v. Herron*, 2d Dist. Montgomery No. 28146, 2019-Ohio-3292 (rejecting a self defense claim when victim suffered horrific injuries and defendant was unharmed)

{¶ 33} Defendant's version of events was that Patton came at him with a knife and that he quickly dispossessed him of it. Even if, for the sake of argument, we were to accept that as true, Fisk then pulled out his own weapon and used it on a then-unarmed man; that cannot be self-defense because, if Patton no longer possessed a knife, Fisk would not have had the imminent threat of death or great bodily harm needed for self-defense. *Accord Smith* at ¶ 21-23 (the court's improper exclusion of evidence about the victim's previous conduct was harmless error when defendant's attack on the unarmed victim negated the self-defense claim).

{¶ 34} The evidence presented at trial negated Fisk's theory of self-defense and rendered the issue of his state of mind irrelevant. The court's error was harmless, and Fisk's assignment of error is overruled.

### III.     Restitution

{¶ 35} The State has filed a cross-appeal and argues that the trial court erred by not granting the restitution requested by Patton.

{¶ 36} R.C. 2929.18(A)(1) permits a trial court to order restitution "by the offender to the victim of the offender's crime * * * in an amount based on the victim's economic loss." If restitution is imposed, the statute states that restitution may be made "to the victim in open court, to the adult probation department that serves the county on behalf of the victim, to the clerk of courts, or to another agency designated by the court." *Id.*

{¶ 37} In February 2018, Marsy's Law, the amendment to the Ohio Constitution, Article I, Section 10a, expanded the rights of crime victims. Key to this case, Marsy's Law gives a victim the right to "full and timely restitution from the person who committed the criminal offense or delinquent act." Ohio Constitution, Article I, Section 10a(A)(7).

{¶ 38} The amendment also describes the process which must be followed to receive restitution. "The victim, the attorney for the government upon request of the victim, or the victim's other lawful representative, in any proceeding involving the criminal offense * * * may assert the rights enumerated in this section. * * * If the relief sought is denied, the victim or the victim's lawful representative may petition the court of appeals for the applicable district, which shall promptly consider and decide the petition." Ohio Constitution, Article I, Section 10a(B).

{¶ 39} As previously stated, the State argues that Patton should have been

granted $177,179.58 in restitution to cover medical expenses the VA purportedly would not cover. At the very least, the State contends, the trial court should have granted Patton the opportunity to obtain additional documentation to prove his case. Fisk, on the other hand, asserts that the State does not have standing to appeal this issue. We conclude Fisk is correct.

{¶ 40} Ohio Constitution, Article I, Section 10a(B) is only two sentences long, but it dictates who can vindicate the rights of a crime victim and in what court. The first sentence states: "The victim, the *attorney for the government* upon request of the victim, or the victim's other lawful representative, in any proceeding involving the criminal offense or delinquent act against the victim or in which the victim's rights are implicated, may assert the rights * * * afforded to the victim."  (Emphasis added). It is important to note that in this sentence, the drafters of the constitutional amendment specifically included the *attorney for the government* – the State – as a party with the ability to advocate for the victim. Compare that with the next sentence: "If the relief sought is denied, the victim or the victim's lawful representative may petition the court of appeals for the applicable district, which shall promptly consider and decide the petition." Any mention of the *attorney for the government* is gone, and that distinction is important.

{¶ 41} One of the major canons of statutory interpretation is that a legislature is presumed to act purposely when it includes language in one section but omits it in another. *NACCO Indus., Inc. v. Tracy*, 79 Ohio St.3d 314, 316, 681 N.E.2d 900 (1997), citing *Chicago v. Environmental Defense Fund*, 511 U.S. 328, 338, 114 S.Ct. 1588, 128 L.Ed.2d 302 (1994). This is also sometimes called the "negative implication" cannon. Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 111

(2012).

{¶ 42} In *United States v. Giordano*, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974), the court discussed a statute which established procedures for obtaining court orders for the interception of wire and oral communications. The text stated that the "Attorney General * * * or any Assistant Attorney General * * * designated by the Attorney General" could approve the application of an order. Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. 2510-2520. In that case, the Attorney General's executive assistant applied for and received the wiretap. *Id.* at 510. Giordano averred that his recorded conversations should have been excluded from trial because they were unlawfully obtained, in that the executive assistant was not listed as someone who could apply for the wiretap. *Id.* A unanimous court agreed and stated that the law gave two types of officials the ability to get the wiretaps, and the executive assistant was not one of them. *Id.* at 514.

{¶ 43} Similarly, in this case, the *attorney for the government* is explicitly mentioned as a party that may advocate for the victim's rights at the trial level but is omitted from the sentence that deals with what happens after relief is denied. Had the drafters of Marsy's Law intended for the State to be able to advocate on appeal for a victim after relief was denied below, they would have included the *attorney for the government* language. They specifically did not, instead only mentioning *the victim* or the *victim's lawful representative*.

{¶ 44} This determination leaves the State without standing to appeal this particular issue. "Standing does not depend on the merits of the plaintiff's claim; rather standing depends on whether the plaintiffs have alleged such a personal stake in the

outcome of the controversy that they are entitled to have a court hear their case." 73 Ohio Jur.3d Parties § 4. Another formulation, which is derived from federal case law, states that in order to establish standing, a litigant must show that he "suffered (1) an injury that is (2) fairly traceable to the defendant's allegedly unlawful conduct, and (3) [is] likely to be redressed by the requested relief." *Moore v. Middletown*, 133 Ohio St.3d 55, 60, 2012-Ohio-3897, 975 N.E.2d 977, citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

{¶ 45} In this case, the State does not have such a nexus. The "injured" party, the party with a personal stake in the matter, is not the State, but Patton. It is Patton's medical bill and the restitution would go to him. Further, it is well-established that the victim of a crime is not a party to a criminal proceeding. *State v. Williams*, 7th Dist. Mahoning No. 09 MA 11, 2010-Ohio-3279; *State v. Roach*, 6th Dist. Lucas No. L-16-1303, 2017-Ohio-8511; *State v. Godfrey*, 3d Dist. Wyandot No. 16-12-06, 2013-Ohio-3396. "[T]he appropriate parties in a criminal proceeding are the state and the defendant." *Id.* at ¶ 30. The victim's interests are not being represented in a criminal case, but rather, those of the people of the State of Ohio. *Id.* at ¶ 31. In other words, the State cannot appeal the denial of a restitution order because it has suffered no injury. The aggrieved party, in this case Patton, is not properly part of the case.

{¶ 46} Because it does not have standing to appeal the trial court's decision to deny restitution, the State's assignment of error in the cross-appeal is overruled.

## IV.    Conclusion

{¶ 47} Having overruled both Fisk's and the State's assignments of error, the trial court's judgment will be affirmed.

. . . . . . . . . . . . .

DONOVAN, J., concurs.

TUCKER, P.J., concurs:

{¶ 48} I write separately because, in my view, when self-defense – and thus the defendant's state of mind – is an issue, specific instances of the victim's past violent behavior known to the defendant at the time of the confrontation must, at least in the first instance, be submitted through the defendant's testimony. Therefore, in my opinion, the trial court correctly excluded the contested testimony, albeit upon incorrect reasoning.

{¶ 49} If evidence is presented which "tends to support the conclusion 'that the defendant used force against another in self-defense * * *, the state must prove beyond a reasonable doubt that the defendant did not use the force in self-defense * * *.' " *State v. Smith*, 2021-Ohio-1185, ___ N.E.3d ___, ¶ 21 (8th Dist.), quoting *State v. Smith*, 1st Dist. Hamilton No. 190507, 2020-Ohio-4976, ¶ 49, citing R.C. 2901.05(B)(1). Since the elements of self-defense are in the conjunctive, "the state need only disprove one of the elements of self-defense beyond a reasonable doubt * * * to sustain its burden." *Id.*, citing *Smith* at ¶ 49. (Other citations omitted.) Thus, in order to sustain its burden of proof, "the state must demonstrate (1) that the defendant was at fault in creating the situation giving rise to the affray; [or] (2) that the defendant lacked a bona fide belief that he was in imminent danger of death or great bodily harm * * *; or (3) that the defendant violated a duty to retreat or avoid danger." *Id.*, citing *State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, ¶ 258, quoting *State v. Barnes*, 94 Ohio St.3d 21, 24, 2002-Ohio-68, 759 N.E.2d 1240. (Other citations omitted.)

{¶ 50} The evidence at issue in this appeal concerns whether Fisk had a bona fide belief that the use of deadly force was necessary because he was in immediate danger of death or serious injury. Fisk, though he did not have the burden of proof, certainly had the right to present evidence in an effort to rebut the state's evidence that he did not have a good faith belief that he was in imminent danger of death or serious injury. The issue, then, is how, consistent with the rules of evidence and the caselaw, such evidence must be presented.

{¶ 51} When self-defense is an issue, evidence concerning the victim's past violent conduct falls into two categories: (1) testimony regarding the defendant's state of mind at the time of the encounter and (2) evidence concerning the defendant's character with this evidence being relevant to whether the victim was the initial aggressor. *State v. Mason*, 6th Dist. Lucas Nos. L-02-1211, L-02-1189, 2003-Ohio-5974, ¶ 38, citing *State v. Cuttiford*, 93 Ohio App.3d 546, 554, 639 N.E.2d 472, (9th Dist.1994). Though the second category is not implicated in the pending case, a discussion of this category is helpful to the analysis. Evidence concerning whether the victim was the initial aggressor is limited to reputation or opinion testimony regarding the defendant's propensity for violence. *Barnes* at ¶ 24. As such, evidence of the victim's specific violent behavior is not permitted. *Id.* The rationale for this conclusion is that, although Evid.R. 404(A)(2) allows the introduction of evidence regarding a pertinent character trait of the victim, the introduction of such evidence is regulated by Evid.R. 405. Evid.R. 405(A) allows opinion or reputation testimony concerning a relevant character trait. But when a character trait is an essential element of a "charge, claim, or defense," evidence of the character trait may be introduced through "specific instances of such conduct." Evid.R. 405(B). Since a victim's "violent

propensity" is not an element of self-defense, a defendant cannot introduce specific violent acts committed by the victim to rebut the state's evidence that the defendant was the first aggressor. *Id.*[1]

**{¶ 52}** Turning, then, to the issue relevant to this case (Fisk's state of mind at the moment of the encounter), it has consistently been held that despite the *Barnes* edict, a defendant "may testify about specific instances of the victim's prior conduct which were known to [the] defendant in order to establish [his] state of mind." *State v. Gott*, 6th Dist. Lucas No. L-11-1070, 2013-Ohio-4624, ¶ 35, citing *State v. Carlson*, 31 Ohio St.3d 72, 73, 508 N.E.2d 999, (8th Dist.1986). *See also State v. Herron*, 2d Dist. Montgomery No. 28146, 2019-Ohio-3292, ¶ 28; *State v. Davis*, 5th Dist. Stark No. 2003 CA 429, 2004-Ohio-7056, ¶ 25; *State v. Fitch*, 8th Dist. Cuyahoga No. 29937, 2002-Ohio-4891, ¶ 28, *reversed on other grounds*, 104 Ohio St.3d 156, 2004-Ohio-6387, 818 N.E.2d 1171. Such evidence is introduced "to establish not the victim's character * * *, but his own state of mind." (Citations omitted.) *Herron* at ¶ 28. Such evidence must, at least initially, be introduced through the defendant's testimony. *Gott* at ¶ 36; *Davis* at ¶ 25 ("witnesses [other than the defendant] are not permitted to testify to the victim's specific instances of violent conduct to establish the defendant's state of mind, i.e. his bona fide belief that he is in imminent danger.") This conclusion is appropriate because another witness cannot know – and thus cannot testify to – the defendant's state of mind regarding how the victim's past conduct affected the imminent danger calculus. If the presentation of

---

[1] As discussed, the R.C. 2901.05(B)(1) amendment has shifted the self-defense burden of proof to the state. But the self-defense elements remain the same. *Smith*, 2021-Ohio-1185, ___ N.E.3d ___, ¶ 21. Thus, in my opinion, the methods for introducing evidence of the victim's past violent conduct also remains the same.

evidence is not so regulated, evidence concerning a victim's past violent conduct will be inappropriately introduced as character evidence as opposed to state of mind evidence.[2]

{¶ 53} At trial, Fisk, through Patton's cross-examination, elicited evidence of previous encounters between Patton and himself. Such testimony, though problematic in my opinion, is not pertinent to this appeal. But I conclude that the trial court properly prevented cross-examination of Patton regarding past violent conduct not involving Fisk, though based upon flawed reasoning. As discussed, such testimony cannot be introduced to suggest Fisk's state of mind. On this basis, I concur in the majority opinion.

Copies sent to:

Mathias H. Heck, Jr.
Andrew T. French
Stephen P. Hardwick
Hon. Michael W. Krumholtz

---

[2] As noted, the caselaw seems to suggest that witnesses other than the defendant are completely barred from testifying to specific instances of the victim's past violent conduct. I, in contrast, suggest that after the defendant has testified regarding how his state of mind was influenced by the victim's past violent behavior within the defendant's knowledge, the defense should be permitted to present witnesses to corroborate the occurrence of the specific violent conduct set forth by the defendant. *See State v. McGaw*, 123 Ohio St. 196, 200, 174 N.E.741 (1931) ("without * * * corroboration the jury might * * * discredit [the defendant] on the ground that he * * * furnished no corroboration of a story that any accused might easily fabricate to support a claim of self-defense.")